306 Ga. 678
FINAL COPY

### S19A0722. THE STATE v. HAMILTON.

WARREN, Justice.

On November 9, 2015, appellee Paul Hamilton was indicted for the malice murder of Brandon Lay, the felony murder of Lay predicated on aggravated assault, and the aggravated assaults of Lay, Teddi Taylor, and Judy Hewatt. On October 5, 2018, a jury found Hamilton not guilty of malice murder but guilty of the remaining crimes. On October 25, 2018, the trial court, on its own motion, granted Hamilton a new trial on general and legal grounds. The State appeals, see OCGA §§ 5-7-1 (a) (8); 5-7-2 (c), and for the reasons that follow, we affirm.

1. The evidence presented at trial showed the following.[1]

---

[1] Because we are not reviewing a defendant's conviction on direct appeal, we do not review the evidence in the light most favorable to the jury's verdicts under the familiar standard set forth in *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

Hamilton owned a mobile home at 1302 Charlie Hall Road in Barrow County. Lay grew up in the mobile home with Hamilton and his wife, who was Lay's aunt.[2] When Lay was a teenager, Hamilton required Lay to leave that residence, and the two did not remain in contact with each other. In October 2015, Lay, who was then 32 years old, was living in Statham, Georgia, with his girlfriend, Teddi Taylor. Lay had recently been released from prison and was doing odd jobs to earn money. Hamilton still owned the property at 1302 Charlie Hall Road, but did not live there, and the mobile home was in disrepair, with the roof and floor sagging in certain spots and items strewn all over the floor of the home.

The events that led to Lay's death began when Lay and Taylor drove a U-Haul truck to Hamilton's mobile home in the early morning hours of October 17, 2015, to take some household items. Lay proceeded to take items out of the house, including blankets, towels, and a dresser. Around 7:00 that same morning, James

---

[2] Lay's mother testified that she "signed" Lay "over to" Hamilton and his wife when Lay was 17 months old.

Wilson, Jacob Wilson (James's son), and John Johnson arrived at 1302 Charlie Hall Road to hunt on Hamilton's property. Hamilton had given the Wilsons permission to hunt there. When they arrived, they parked their pickup truck behind Lay's U-Haul. The stories from Taylor and from the Wilsons differ as to what happened next.

Taylor testified that Lay was locking the mobile home before she and Lay left and that she was standing near the front passenger door of the U-Haul when "a truck come flying in the driveway." The people that were in the truck began yelling at her and Lay to leave, saying that they were going to call 911. Lay told Taylor to tell the people in the truck that they were not stealing, and Taylor walked toward the back of the U-Haul. She explained that this is where her boyfriend grew up and that they were not stealing. Taylor said that the men started shooting at her, that she could "literally feel the bullet just part my hair," and that she and Lay jumped into the cab of the U-Haul, with the men shooting at them the whole time. Lay backed up the U-Haul, ramming James's truck several times and

3

enabling Lay and Taylor to escape.[3]

James Wilson testified that, when he, Jacob, and Johnson arrived at the property and got out of his truck, it was "dark," although it was starting to get "a little daylight," and that they saw a U-Haul truck parked in the driveway. James walked in front of his truck and was standing 15 to 20 feet behind the U-Haul. He saw a blonde woman standing by the back of the U-Haul, but he did not recognize her and did not get a good look at her. James asked the woman what she was doing and said that he was going to call 911. The Wilsons both testified that they did not fire any shots at Taylor and that, after James said that he was going to call 911, they heard the U-Haul's engine start. The U-Haul then backed up "full throttle." James "jumped out of the way," and the U-Haul rammed his truck multiple times. James, who had a pistol, fired a shot into the ground to try to get the U-Haul to stop. Even though James's

---

[3] Four days after the incident, in contrast to her testimony that "a truck" came into Hamilton's driveway, Taylor told a lieutenant with the Barrow County sheriff's office that "multiple vehicles and six hunters" drove into Hamilton's driveway on the morning of the incident.

4

truck was in park, the force of the U-Haul's ramming pushed it out of the U-Haul's path. James ran behind his truck, which hit him and knocked him into a ditch. According to Jacob, his father's pickup truck was being pushed toward his father in the ditch, prompting Jacob to fire several shots at the tires of the U-Haul.

After Lay pushed James's truck out of the way with his U-Haul, he and Taylor drove off in the direction of Old Hog Mountain Road. Because the back of the U-Haul was not closed, some household belongings fell out of the U-Haul on Hamilton's property and along Charlie Hall Road down to its intersection with Old Hog Mountain Road, which was about a quarter of a mile away. Lay drove the U-Haul to a place near the home of an acquaintance, Judy Hewatt, where he parked it. He and Taylor then walked to Hewatt's home.

The Wilsons reported the incident to the sheriff's office, and James asked his wife, Chanda, to get in touch with Hamilton and tell him about the incident. James also told Chanda that a blonde woman was involved in the incident. A deputy sheriff responded to

5

the Charlie Hall Road property, finished his investigation, and left before Hamilton arrived. When Hamilton arrived, he and the Wilsons were cleaning up some of the items that had fallen out of the U-Haul on the driveway and in the road, and during the clean-up found a purse and cell phone. They called the sheriff's office, and the deputy sheriff returned to the property. The deputy collected the purse and cell phone, and the purse contained a credit card with Taylor's name on it. Hamilton told the deputy that "if I catch anyone else on my property you'll need to call the coroner." About 20 minutes after the deputy left, Hamilton and the Wilsons left the Charlie Hall Road property, with Hamilton leaving first.

Hewatt testified that, later that morning, she drove Lay and Taylor in her pickup truck to the intersection of Charlie Hall Road and Old Hog Mountain Road, where some items had fallen out of the U-Haul. Hewatt testified that she parked her truck, which had only front-passenger seating, on the side of the road, and she, Lay, and Taylor began picking up items. At the same time, Chanda Wilson and her daughter, Celena, were driving to Hamilton's property and

6

went through the intersection of Charlie Hall Road and Old Hog Mountain Road, where they saw two blonde women and a man picking up household belongings that were spread along the side of the intersection. Chanda then drove down Charlie Hall Road toward Hamilton's property, where she saw Hamilton's car approaching and stopped it. Because she had been told that a blonde woman had been involved in the incident at Hamilton's property, she told him about the people at the intersection and noted that they might have been involved in the early morning incident at his property. When Hamilton left, he drove down Charlie Hall Road toward Old Hog Mountain Road. Shortly thereafter, the four members of the Wilson family left Hamilton's property and headed home in their two vehicles. Their drive home took them to the intersection of Charlie Hall Road and Old Hog Mountain Road.

When Hamilton arrived at the intersection, Lay, Taylor, and Hewalt were walking back to Hewatt's truck. The three got into the truck, with Hewatt in the driver's seat, Taylor in the middle seat, and Lay in the passenger seat. Hamilton parked his car in front of

Hewatt's truck. James and Jacob Wilson arrived at the intersection shortly after Hamilton and parked their truck nearby, with Chanda Wilson and her daughter arriving shortly thereafter. Jacob recognized Taylor as the blonde woman who had been involved in the earlier incident, but he did not tell Hamilton.[4]

What happened next is also subject to dispute. At trial, Taylor testified that Hamilton got out of his car and approached the driver's side of Hewatt's truck carrying a handgun. She testified that Lay screamed, "he's going to kill us," and pushed Taylor back in her seat. Hamilton then fired his gun, hitting Lay in the head. Taylor added that Hamilton said that he had "killed that motherf**ker dead"; that she did not remember if Hamilton's gun was inside or outside of the truck when he fired; and that neither she nor Lay touched Hamilton before Hamilton shot Lay. On cross-examination, Taylor admitted that, in her initial statement to the police, she did not tell the interviewing officer about going to 1302 Charlie Hall Road earlier

---

[4] Neither James nor Jacob could identify the driver of the U-Haul, and James testified that he could not identify the woman involved in the incident.

that morning or about the incident that happened there. She also admitted that she and Lay had been up most of the night before the incident and had taken methamphetamine with syringes that were later found at Hamilton's property.

Hewatt testified that, after Hamilton parked his car, he came to the driver's side of her truck with a gun. She also saw James and Jacob Wilson there and testified that they said, "that's her in the middle." According to Hewatt, the Wilsons tried to open her door, and they "kept on saying, he's going to kill you. He's going to shoot you." Hewatt added that the Wilsons "tried to open my door," "so I closed it back and locked it." She then heard the gun go off. Lay was shot in the temple and died. Hewatt testified that she did not know at first that Lay had been shot because Hamilton had his hands on top of her hands on the steering wheel. Hewatt expressed a belief that Hamilton must have "shot with his left hand." Hewatt added that neither she, nor Lay, nor Taylor attempted to grab or fight Hamilton.

James Wilson testified that when he and Jacob arrived at the

intersection of Charlie Hall Road and Old Hog Mountain Road, Hamilton was approaching Hewatt's truck. He and Jacob got out of their truck; James asked Jacob to call 911, which he did; and James walked toward Hewatt's truck. James testified that there was a lot of "hollering going on" and that Hamilton kept telling Hewatt to give him the keys to her truck. At one point, according to James, the truck "revved up" and "made a racket." About that time, James's wife and daughter drove up and parked, and James went to their car to keep them from approaching the scene. According to James, he was not by Hewatt's truck when the shot was fired; Jacob never approached the truck; and Jacob never identified Taylor as one of the participants in the incident earlier that morning. James also never heard Hamilton threaten anyone in Hewatt's truck.

Jacob Wilson testified that he called 911 after he got out of his father's truck. He added that it seemed like Hamilton was arguing with someone in the truck, but that he could not hear what they were saying. According to Jacob, he never spoke to Hamilton at the scene of the shooting; he could not see what Hamilton was doing

10

with his hands; and he was talking to a 911 operator when a shot was fired. Jacob testified that, after the shooting, Hewatt and Taylor ran from Hewatt's truck, and Hamilton walked back toward his car saying "I told you not to reach for my gun." Jacob testified that neither he nor his father told the occupants of Hewatt's truck that Hamilton would shoot them, nor did he hear Hamilton threaten anyone. Although Jacob got a good look at Taylor during the incident earlier that morning and could identify her, he did not tell Hamilton about that while everyone was parked at the intersection.

Celena Wilson testified that, when she and her mother arrived at the intersection of Charlie Hall Road and Old Hog Mountain Road, Hamilton was standing by Hewatt's pickup truck and appeared to be angry. She saw him reach his arms inside the truck, perhaps in an attempt to get the keys out of the ignition, and testified that he moved "as if he were being pulled a certain way or, like, getting — trying to move around somebody or something." According to Celena, Hamilton's movement was "kind [of] like a bobbing and weaving" and would not have been from just reaching

11

for the keys. Celena also testified that, at the time of the shooting, her brother was talking on the phone and her father was standing close to Celena near her mother's car, which was 30-40 feet from the shooting.

Chanda Wilson testified that when she and Celena arrived at the intersection, Celena got out of the car and James walked over to them and told them to get back in the car. Although she heard loud voices, she did not see what happened in Hewatt's truck.

Hamilton did not testify at trial, but in two statements to the police on the day of the crimes, he said (among other things) that when he saw Chanda Wilson on Charlie Hall Road, she told him that the people who had burglarized his property were at the intersection of Charlie Hall Road and Old Hog Mountain Road. He said that he then drove to that intersection and parked his car in front of Hewatt's truck. He got out of his car holding his gun by his side in his right hand and approached the driver's side of the truck, which had the window rolled down most of the way. According to Hamilton, at some point after James Wilson arrived at the

12

intersection, James told Hamilton that the male and female passengers had been involved in the earlier incident at his property. Hamilton said that he repeatedly told the occupants of the truck not to leave and insisted that his purpose was to temporarily detain Taylor and Lay for the police. He added that he thought about shooting through the truck's cab to break out the passenger-side window and "let them know that [he] meant business," but that he "probably would not have." According to Hamilton, when Hewatt started the truck, Hamilton reached into the truck with his left hand and attempted to take the key out of the ignition. Lay grabbed Hamilton's left hand and began banging his left arm on the keys and steering wheel. Hamilton stated that at that point, he was concerned for his safety because he knew that two of the occupants of the truck had tried to run over James Wilson earlier that morning. Hamilton then put his right hand into the truck to pull his left hand away from Lay. Hamilton added that his finger must have been on the trigger of the gun, although he did not intentionally place it there. While pulling away from Lay's grasp, Hamilton said, the gun

13

"unfortunately" discharged; he added that he did not intend to shoot anybody and that he did not point the gun at the occupants of the car. Photographs admitted into evidence showed that Hamilton had an abrasion on his left arm several inches above his wrist.

After five days of trial, a jury found Hamilton not guilty of the malice murder of Lay, but guilty of the felony murder of Lay, as well as the aggravated assaults of Lay, Taylor, and Hewatt. The trial court later granted Hamilton a new trial on two grounds. First, the court concluded that a new trial was warranted because it had committed harmful error in its jury charge in several respects. Second, the court granted a new trial because it found that the jury's verdict "was contrary to the evidence and principles of justice and equity, and that the evidence adduced at trial was decidedly and strongly against the weight of the evidence to support conviction on these charges, as determined by the court sitting as a 13th juror. OCGA §§ 5-5-20, 5-5-21."

2. The State contends that the trial court erred in granting Hamilton a new trial on the general grounds. We disagree.

14

It is well settled that

> [e]ven when the evidence is legally sufficient to sustain a
> conviction, a trial judge may grant a new trial if the
> verdict of the jury is "contrary to . . . the principles of
> justice and equity," OCGA § 5–5–20, or if the verdict is
> "decidedly and strongly against the weight of the
> evidence." OCGA § 5–5–21. When properly raised in a
> timely motion, these grounds for a new trial—commonly
> known as the "general grounds"—require the trial judge
> to exercise a "broad discretion to sit as a 'thirteenth
> juror.'" In exercising that discretion, the trial judge must
> consider some of the things that [he] cannot when
> assessing the legal sufficiency of the evidence, including
> any conflicts in the evidence, the credibility of witnesses,
> and the weight of the evidence. Although the discretion
> of a trial judge to award a new trial on the general
> grounds is not boundless—it is, after all, a discretion that
> "should be exercised with caution [and] invoked only in
> exceptional cases in which the evidence preponderates
> heavily against the verdict"—it nevertheless is, generally
> speaking, a substantial discretion.

*White v. State*, 293 Ga. 523, 524-525 (753 SE2d 115) (2013)

(citations and footnote omitted). Moreover, as directed by OCGA

§ 5-5-50, "[a]n appellate court will not disturb the first grant of a

new trial based on the general grounds unless the trial court abused

its discretion in granting it and the law and the facts demand the

verdict rendered." *State v. Hamilton*, 299 Ga. 667, 670-671 (791

15

SE2d 51) (2016).

(a)  The State contends that we must reverse the grant of Hamilton's motion for new trial on the general grounds because the trial court erred by applying the legal standard for the sufficiency of the evidence laid out in *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979), instead of weighing the evidence as the thirteenth juror.  This contention is without merit.  Although the trial court did briefly mention the *Jackson v. Virginia* standard at the hearing at which it granted a new trial, it quickly followed that statement with the correct standard for the general grounds and by stating that it would grant a new trial based on those standards. Specifically, the court stated that it was "sitting as [the] 13th juror," that the verdict "at trial was decidedly and strongly against the weight of the evidence," and that "a new trial is consistent with the principles of equity and justice."  Additionally, the court's written order unequivocally applied the correct standard of OCGA §§ 5-5-20 and 5-5-21 in granting Hamilton a new trial, explaining that it was granting a new trial because the verdict "was contrary to the

16

evidence and principles of justice and equity." And even if there were a discrepancy between an oral pronouncement and a written ruling, it is well settled that the discrepancy "'will be resolved in favor of the written judgment.'" *State v. Mondor*, 306 Ga. 338, 351 (830 SE2d 206) (2019) (citation omitted). The State's contention therefore fails.

(b) Relying on *State v. Holmes*, 304 Ga. 524 (820 SE2d 26) (2018), the State also contends that the trial court erred by ruling that it made several errors in its jury charges during trial and by then relying on that ruling, at least in part, to grant the motion for new trial on the general grounds. In *Holmes*, this Court concluded that "[a] trial court . . . does not properly exercise its discretion" as a thirteenth juror under OCGA §§ 5-5-20 and 5-5-21 "when it applies an improper legal standard of review, as opposed to its own discretion as the thirteenth juror, to the general grounds for new trial." Id. at 531-532. In granting the motion for new trial on the general grounds, the trial court in *Holmes* relied, in part, on a legal, evidentiary error that it concluded it had made at trial. See id.

17

"Because this legal ground for granting the motion [did] not comply with OCGA §§ 5-5-20 and 5-5-21," we vacated the grant of the motion for new trial on the general grounds. Id. at 532. But here, unlike in *Holmes*, the trial court did not, in fact, rely on the legal errors it identified when it granted a new trial on the general grounds. Indeed, the trial court's order granting a new trial bears that out: following the paragraph in which the court outlined the jury-charge errors on which it granted a new trial, the court began a new, separate paragraph in which it clearly and separately applied its discretion as the thirteenth juror to grant a new trial. Because the trial court did not purport to grant a new trial on the jury-charge error under the mantle of its discretion as a thirteenth juror, and because it separately conducted a thirteenth-juror analysis that provided a second basis on which a new trial could be granted, this contention by the State has no merit.

(c) The State also attacks the trial court's grant of a new trial on procedural grounds, arguing, among other things, that the court erred in acting on its own to grant a new trial, erred in failing to

18

specify in detail why it believed the weight of the evidence was against the verdict, and erred in failing to wait for the transcript to be prepared before granting a new trial. The contentions are without merit. First, trial courts are authorized to grant motions for new trial on their own motion within 30 days of the entry of judgment, which is what happened here. See OCGA § 5-5-40 (h) ("The court also shall be empowered to grant a new trial on its own motion within 30 days from entry of the judgment, except in criminal cases where the defendant was acquitted."). Second, we have before rejected a challenge to the denial of a motion for new trial on the ground that the trial court did not make detailed findings regarding its exercise of discretion as a thirteenth juror, explaining that "we are aware of no authority—and, indeed, [the defendant] has directed us to none—requiring such express findings." *Wilson v. State*, 302 Ga. 106, 109 (805 SE2d 98) (2017). Third, the State has not pointed to any authority that requires a trial court to wait for a transcript to be prepared before exercising its discretion as a thirteenth juror. "The trial judge had presided over the entire trial . . . and thus had

sufficient time and familiarity with the case to formulate his thoughts as the thirteenth juror." *State v. Holmes*, 306 Ga. 647, 652 (832 SE2d 777) (2019). See also *State v. Harris*, 292 Ga. 92, 94 (734 SE2d 357) (2012) ("[T]he trial court is given a significant amount of deference to exercise its sound discretion because it was an observer of what transpired at trial."). Finally, here, the trial court's written order specifies that it evaluated the testimony and evidence at trial in reaching its decision to grant a new trial, and the State has not demonstrated that the trial court failed to exercise properly its discretion. See *Wilson*, 302 Ga. at 108 ("[U]nless the record shows otherwise, we must presume that the trial court understood the nature of its discretion and exercised it. This Court will thus presume, in the absence of affirmative evidence to the contrary, that the trial court did properly exercise such discretion." (citation and punctuation omitted)).

(d) The State contends that, on the merits, the trial court abused its discretion in granting Hamilton a new trial on the general grounds. In granting the motion, the trial court explained in its

20

written order that, "as determined by [it] sitting as a 13th juror" and based "on the conflicts in the testimony and in the evidence" and the "Court's perception of the credibility of the witnesses," the grant of a new trial was consistent with "principles of equity and justice." The trial court expressed similar considerations at the hearing at which it granted Hamilton a new trial.

Having reviewed the entire record, and considering that the trial court was authorized, as the thirteenth juror, to discount Taylor's and Hewatt's testimony and to credit Hamilton's story, and bearing in mind the standard of review set forth in OCGA § 5-5-50, we cannot say that the trial court's conclusion was an abuse of its substantial discretion to grant Hamilton a new trial. See *Hamilton*, 299 Ga. at 670-671 ("An appellate court will not disturb the first grant of a new trial based on the general grounds unless the trial court abused its discretion in granting it and the law and the facts demand the verdict rendered.").[5]

---

[5] Because we conclude that the trial court did not abuse its discretion in granting a new trial on the general grounds, we do not need to address the

*Judgment affirmed.  All the Justices concur.*

DECIDED SEPTEMBER 3, 2019.
Murder. Barrow Superior Court. Before Judge Motes.
*J. Bradley Smith, District Attorney, Patricia J. Brooks,*

State's argument that the trial court erred in granting a new trial based on its conclusion that it had committed errors in its jury charge.  See *State v. Cash*, 298 Ga. 90, 97 n.6 (779 SE2d 603) (2015).

*Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellant.

*Jeffrey R. Sliz; Matthew K. Winchester*, for appellee.