307 Ga. 160
FINAL COPY

S19A0535.  THE STATE v. BEARD.

WARREN, Justice.

On November 21, 2014, appellee Dexter Beard was indicted for the malice murder of Selemon Belai; felony murder predicated on the aggravated assault of Belai; four counts of aggravated assault with a deadly weapon of Belai, Cedric Jeffries, Lee Bailey, and Benny Martin; aggravated battery of Jeffries; and the possession of a firearm during the commission of a felony.  On December 7, 2015, a jury found Beard guilty of all crimes except the aggravated assault and aggravated battery of Jeffries.  Following the verdict, the trial court sentenced Beard to, among other things, life imprisonment for malice murder.  On October 31, 2018, the trial court granted Beard's motion for new trial in an 18-page order, exercising its discretion as the "thirteenth juror."[1]  The State now appeals the trial court's grant

---

[1] We have explained before that
the grounds set forth in OCGA §§ 5-5-20 and 5-5-21, which "are

of Beard's motion for new trial.  See OCGA §§ 5-7-1 (a) (8) and 5-7-2 (c).  For the reasons that follow, we affirm.

1.  The evidence presented at trial showed the following.[2]  In the early morning hours of June 3, 2014, a group of people were gathered at the intersection of Auburn Avenue and Bell Street in Fulton County.  Testimony differed on how big of a crowd congregated at the intersection, but estimates ranged from 12 to 25 people.  Some were gambling on a dice game while others watched.  The onlookers and gambling participants generally knew each other, and many had grown up together in the same neighborhood.  Many people were drinking, and one gambling participant stated that "everybody was just having a good time."  The gamblers were

commonly known as the 'general grounds' for new trial," authorize "the trial judge to sit as a 'thirteenth juror' and to exercise his or her discretion to weigh the evidence on a motion for new trial alleging these general grounds."
*State v. Holmes*, 306 Ga. 647, 649 n.1 (832 SE2d 777) (2019) (citation omitted).

[2] Because we are not reviewing a defendant's conviction on direct appeal, we do not review the evidence in the light most favorable to the jury's verdicts under the familiar standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).  See *State v. Denson*, 306 Ga. 795 n.1 (833 SE2d 510) (2019).

"shoot[ing the dice] up against [a] wall" and "hunched over" in a horseshoe formation around the game, and the pot had grown to several thousand dollars in cash, which was lying on the ground.

Beard and Belai were both gambling, and — as an emergency medical physician and a forensic toxicologist would later testify — both men's blood-alcohol levels were at least twice the legal limit for driving.[3] Beard was winning the dice game when Belai accused him of cheating, prompting an argument between the two. The situation escalated quickly. A gunfight broke out, and both men fired multiple shots. Beard ran away toward his car and the crowd scattered. When the shooting stopped, the money was no longer on the ground. Beard and Belai, however, were both lying on the ground and severely injured. Bailey, Martin, and Jeffries, who had all been in the vicinity of the dice game, also suffered wounds from the gunfire. Belai died in the hospital soon afterward from gunshot wounds to his torso and extremities. Beard survived but was hospitalized for

---

[3] At trial, a toxicologist also testified that Belai had consumed some form of cocaine within 12 hours of his death.

four months, underwent more than ten surgeries, and had part of his foot amputated.

The evidence at trial showed that Beard was armed with a silver and brown .357 magnum revolver and that Belai was armed with a small, black .40-caliber Glock on the night of the dice game. A firearms examiner testified that all of the ballistic evidence collected from the scene was connected to either Beard's or Belai's guns. That evidence included: five .38-caliber lead bullets, six .38-caliber cartridge cases, twelve .40-caliber cartridge cases, and three .40-caliber metal jackets for bullets.[4]

The medical examiner testified that Belai, who suffered five gunshot wounds, had been shot in the left arm, the left side of the torso, the left thigh, the right thigh, and the back. She further testified that three of the gunshots went from left to right, back to

---

[4] The firearms examiner testified that four of the five .38-caliber lead bullets matched Beard's gun (the .357 magnum revolver) and also testified that all twelve of the .40-caliber cartridge cases and all three of the .40-caliber bullet jackets matched Belai's gun (the .40-caliber black Glock). Although testing of the fifth .38-caliber lead bullet was inconclusive because the bullet was so damaged, testing revealed that the bullet was consistent with being fired from a .357 magnum revolver. The firearms examiner did not specifically testify about the six .38-caliber cartridge cases.

front, and downward; the gunshot to the left thigh went from front to back; and the "directionality" of the gunshot to the right thigh "in terms of front and back" was uncertain. Four of the five bullets exited Belai's body. Although the medical examiner could not determine which gunshot occurred first or how Beard and Belai were positioned in relation to one another at the time of the shooting, she agreed that Belai's gunshot injuries were inconsistent with Belai facing the gun's muzzle, except for the shot to his left thigh. And she explained that "even the gunshot wound . . . causing the most severe blood loss [would not] make [Belai] immediately incapacitated," meaning it would not be "inconsistent" for Belai to travel "some distance down the street" and "actually fire a handgun" after being shot.

An emergency medical physician testified that Beard was shot twice in the left buttocks and twice in the left thigh. The physician testified that none of the gunshots struck Beard from the front.

The stories from various witnesses, including Beard, differed as to what occurred in the moments leading up to and during the

gunfight. Bizuayehu Kassa, Belai's girlfriend, had been sitting in a parked car approximately 28 feet in front of the dice game; she had a "side view of everything" because of the way Beard and Belai were both facing a wall. Kassa's car windows were closed; she could hear loud "noises" and see "hands waving" but could not "hear exactly what [Beard and Belai] were talking about." At trial, Kassa testified that she physically turned and looked when she heard a "confrontational type of noise." Then, using her car's side-view mirror to look directly behind her, Kassa saw Beard with a gun "behind [Belai] as [Belai] was trying to pick up his money" when the gun "went off." Belai was "on his knees, bent over" when Beard shot him. Once Kassa "actually saw [Beard] shoot Belai," she "ducked down" and did not see exactly what happened after that.

Cedric Jeffries testified that on the night of the shooting, he was drinking and "getting high" when he heard a "lot of commotion" and "people yelling." He testified that he walked around the corner onto Auburn Avenue and saw "a bunch of guys" "in a huddle gambling." After hearing arguing and Belai yelling, "gunfire rang"

6

and he ran once he realized he was shot in the hand. At trial, Jeffries maintained that Belai — not Beard — shot first. However, Detective Scott DeMeester testified that when he interviewed Jeffries before trial while Jeffries was in the hospital, Jeffries told DeMeester that Jeffries did not "know who shot him, where the shots were coming from, [and] didn't see anyone with a gun." After being confronted on the stand with a transcript of his recorded interview with DeMeester, Jeffries testified that his interview — in which he stated that he did not see anyone with a gun on the night of the incident — "was incorrect," and that he made that statement "because [he] didn't never want to be a part of this."

Lee Bailey testified that he had gone to the store to get diapers for his daughter when he saw a crowd at the intersection of Auburn Avenue and Bell Street. While he was on his way back home, he heard gunshots and ran back toward the store. At some point, he was shot in the arm. When questioned at trial, Bailey expressly and repeatedly denied being part of the crowd around the dice game. However, Detective DeMeester testified that, when he interviewed

7

Bailey before trial, Bailey told DeMeester that he was "hanging out in [the] area gambling" on the night of the shooting and witnessed Belai and Beard arguing. Further, Benny Martin testified that before shots were fired, he and Bailey had been talking near the dice game and that Bailey had sent Martin to the store to buy a Red Bull for Bailey.[5]

In addition, Martin testified that he walked to the intersection where the gambling game was occurring after getting off work around 3:00 a.m. Martin heard Belai say that somebody was cheating and then heard gunfire as he was walking away. At some point while trying to run away, Martin was shot in the shoulder. Although Martin testified that he had "too much" to drink that night, he denied ever becoming "incapacitated" from consuming too much alcohol. At trial, Martin testified that Belai "pretty much" did the shooting, but "in all actuality" Martin did not "really know who shot first." Detective DeMeester testified that when he drove Martin

---

[5] Bailey testified that he had purchased a Red Bull for himself (not diapers for his daughter) while at the store, and a Red Bull was recovered at the scene of the shooting.

to the homicide office for an interview before trial, Martin told him that "[Beard] shot [Belai] multiple times in the back" "while [Belai's] back was turned to [Beard]." At trial, Martin denied ever making this statement, indicating that he told DeMeester "pretty much the same thing [he] told the jurors." When confronted with DeMeester's report — which recounted the purported car conversation between Martin and DeMeester — Martin repeatedly stated, "I ain't never seen that" and insisted he did not know who shot first.[6]

Finally, Beard testified in his own defense. According to Beard, he was winning the dice game when Belai accused him of cheating. Beard turned his back to count his winnings and then heard shots and "fe[lt] that [he was] getting shot at." Beard then turned toward Belai—which is "where the shots were coming from"—and returned fire before running away. However, Detective DeMeester testified that, during a recorded interview with Beard in the hospital, Beard

---

[6] Martin also testified that he told DeMeester that he believed Beard shot him because, based on the "angle [of] where [they] were standing," "the bullet probably went through [Belai] and went through [Martin] at the same time."

told DeMeester that Beard had been walking to his car from a nearby business when an unknown person started shooting at him and Beard shot back. DeMeester also testified that, during the interview, Beard denied seeing who shot him or seeing anyone "out there that potentially saw who shot him."

After deliberating, the jury found Beard guilty of the murder of Belai; felony murder predicated on the aggravated assault of Belai; three counts of aggravated assault with a deadly weapon of Belai, Bailey, and Martin; and possession of a firearm during the commission of a felony. The trial court sentenced Beard to life imprisonment with a consecutive suspended sentence of five years.

Beard moved for a new trial, and after a hearing, the trial court later granted Beard's motion in a written order, exercising its discretion as "the thirteenth juror" under OCGA §§ 5-5-20 and 5-5-21.

2. The State contends that the trial court erred in granting Beard a new trial on the general grounds. We disagree.

It is well established:

Even when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury is "contrary to . . . the principles of justice and equity," OCGA § 5-5-20, or if the verdict is "decidedly and strongly against the weight of the evidence." OCGA § 5-5-21. When properly raised in a timely motion, these grounds for a new trial — commonly known as the "general grounds" — require the trial judge to exercise a "broad discretion to sit as a 'thirteenth juror.'" In exercising that discretion, the trial judge must consider some of the things that she cannot when assessing the legal sufficiency of the evidence, including any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence. Although the discretion of a trial judge to award a new trial on the general grounds is not boundless — it is, after all, a discretion that "should be exercised with caution [and] invoked only in exceptional cases in which the evidence preponderates heavily against the verdict" — it nevertheless is, generally speaking, a substantial discretion.

*White v. State*, 293 Ga. 523, 524-525 (753 SE2d 115) (2013) (citations omitted). We have reiterated that the trial court has "substantial" discretion when granting a motion for new trial on the general grounds. See, e.g., *State v. Denson*, 306 Ga. 795, 798 (833 SE2d 510) (2019); *State v. Holmes*, 306 Ga. 647, 653 (832 SE2d 777) (2019); *State v. Hamilton*, 306 Ga. 678, 684 (832 SE2d 836) (2019); *State v. Hamilton*, 299 Ga. 667, 670 (791 SE2d 51) (2016).

(a) After presiding over Beard's trial and a hearing on Beard's motion for new trial, the trial court issued an 18-page order, which recounted testimony from individual witnesses, pointed out inconsistencies in the evidence and credibility issues with the witnesses, and concluded that "the eyewitness evidence presented by the State, including the three victims hurt by the crossfire, was weak." Among other things, it specifically found that the "record is filled with conflicting evidence and credibility concerns as to almost every eye witness and the chief investigating officer." The trial court also found that witnesses Martin, Jeffries, and Bailey "h[e]ld almost no credibility as it appeared all were trying to minimize their participation in the events leading up to the shooting"; that "[c]ertain omissions in the evidence left many unanswered questions about what transpired and further suggested that those testifying may not have been entirely forthright"; and that "[t]he strongest evidence against Beard came from two witnesses, the decedent's girlfriend and an investigating officer, but this testimony also presented credibility issues."

12

(b) Contrary to the State's bizarre argument, the jury's verdict was not demanded by the "great physical laws of the universe."[7] See *Hamilton*, 299 Ga. at 670-671 ("An appellate court will not disturb the first grant of a new trial based on the general grounds unless the trial court abused its discretion in granting it and the law and the facts demand the verdict rendered."). Having reviewed the entire record, and considering that the trial court was authorized, as the thirteenth juror, to discount the State's witnesses and to credit Beard's version of events, and bearing in mind the standard of review set forth in OCGA § 5-5-50, we cannot say that the trial court abused its substantial discretion in granting Beard a new trial on

---

[7] To support that proposition, the State cites *Patton v. State*, 117 Ga. 230, 235 (43 SE 533) (1903) ("The great physical laws of the universe are witnesses in every case, and can not be impeached by the feeble voice of man, even though he be speaking under the sanction of an oath."), and *Donald v. State*, 287 Ga. 798, 800 (700 SE2d 390) (2010) ("[N]either a jury nor a court is required to believe evidence or testimony which defies the laws of nature."). But as we explained in *Donald*, that maxim "applies in only extraordinary cases, and only for statements which run contrary to natural law and the universal experience of mankind." *Donald*, 287 Ga. at 800 (quoting *Stephens v. State*, 245 Ga. App. 823, 826 (538 SE2d 882) (2000)). Here, as in *Donald*, contradictory witness testimony "regarding the manner in which [a] shooting took place," does not "contradict the great physical laws of the universe." See id. (punctuation omitted).

the general grounds.  See, e.g., *Denson*, 306 Ga. at 800; *Holmes*, 306

Ga. at 653; *Hamilton*, 306 Ga. at 684.

*Judgment affirmed.  All the Justices concur.*

NAHMIAS, Presiding Justice, concurring.

Since 2011, the State has had the right to immediately appeal

a trial court order granting a new trial to a criminal defendant. See

OCGA §§ 5-7-1 (a) (8), 5-7-2 (b), (c); *State v. Caffee*, 291 Ga. 31, 33

(728 SE2d 171) (2012) (explaining that OCGA § 5-7-2 was amended

14

in 2011 to eliminate the requirement that the State follow interlocutory appeal procedures in order to appeal from an order granting a new trial). When a trial court bases its grant of a new trial on a legal ground that is arguably erroneous, the State has a legitimate point to appeal and may indeed prevail on appeal. See, e.g., *State v. Harris*, 301 Ga. 234, 234 (799 SE2d 801) (2017); *State v. Abernathy*, 289 Ga. 603, 603 (715 SE2d 48) (2011).

When a trial court grants a new trial on the "general grounds" in OCGA §§ 5-5-20 and 5-5-21, however, the State's shot at a successful appeal is much more constrained, given the broad discretion afforded to trial courts under those statutes and the deferential standard of appellate review reiterated in the Court's opinion (which I join in full). The State may be able to prevail if it can demonstrate that the trial court failed to exercise its discretion or the court's exercise of discretion was tainted by a legal error, or in other unusual circumstances. See, e.g., *State v. Holmes*, 304 Ga. 524, 531-532 (820 SE2d 26) (2018) ("A trial court . . . does not properly exercise its discretion when it applies an improper legal

15

standard of review, as opposed to its own discretion as the thirteenth juror, to the general grounds for new trial."); *State v. Jackson*, 295 Ga. 825, 825-826 (764 SE2d 395) (2014) (reversing the purported grant of a new trial on the general grounds by a trial judge who no longer had jurisdiction over the case). See also *State v. Johnson*, 305 Ga. 237, 239 n.5 (824 SE2d 317) (2019) (explaining that even though the trial court "purported to grant the motion on 'discretionary grounds,' the motion was actually granted on legal grounds," changing the type of appellate review).

However, if the verdict at trial depended at all on credibility determinations or the resolution of conflicting evidence, and the State just disagrees — however vehemently — with the trial court's weighing of that evidence as the "thirteenth juror," the State has no realistic chance to prevail on appeal. This is true even if the appellate court might have viewed the evidence in the way the State sees it, and even though the twelve trial jurors viewed the evidence that way in returning a guilty verdict. If this point was not made clear enough by many older decisions of this Court, today's opinion

— along with the three similar decisions this Court has issued in the past two months in *Denson*, *Holmes*, and *Hamilton* — should make the point ineluctable. And the State becomes no more likely to prevail if it makes the sort of argument it has made here, which the Court accurately labels "bizarre." So before the State exercises its right to appeal an order granting a new trial on the general grounds, the State's lawyers should think hard about whether the appeal will amount to anything other than an unnecessary delay in the new trial and a waste of the limited resources of the State, the publicly funded lawyers who represent most of the defendants in these cases, and this Court.

I am authorized to state that Justices Blackwell, Boggs, Peterson, Warren, Bethel, and Ellington join in this concurrence.

DECIDED OCTOBER 31, 2019.
Murder. Fulton Superior Court. Before Judge Downs.
*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General,* for appellant.
*Jessica A. Seares,* for appellee.