In the Supreme Court of Georgia

Decided: March 15, 2021

S20A1505.  PENDER v. THE STATE.
S20A1506.  WHITAKER v. THE STATE.

BETHEL, Justice.

A Muscogee County jury found Christopher Pender and Christopher Whitaker guilty of felony murder and other offenses in connection with the shooting death of David Scott and the assault of Eric Morris. In his appeal, Pender argues that the evidence presented at trial was insufficient to support the jury's verdict on a count of theft by receiving, that the trial court erred by admitting statements from non-testifying co-defendants in violation of *Bruton v. United States*, 391 U. S. 123 (88 SCt 1620, 20 LE2d 476) (1968), that his trial counsel's failure to make certain objections under *Bruton* constituted ineffective assistance of counsel, and that the trial court erred by admitting certain other evidence. Whitaker

argues in his appeal that, in ruling on his motion for new trial on the "general grounds" set forth in OCGA §§ 5-5-20 and 5-5-21, the trial court deprived him of his right against self-incrimination by holding against him that he did not testify and by citing inadmissible character evidence. We affirm in both cases.[1]

---

[1] The crimes occurred on September 19, 2013. On February 10, 2015, a Muscogee County grand jury returned an 18-count indictment against Pender, Whitaker, and three other co-indictees (Jayln Dixon, Donald Fair, and Tyrecquiss Wells), charging each of them with malice murder of Scott (Count 1), felony murder of Scott predicated on aggravated assault (Count 2), aggravated assault of Scott (Count 3), criminal attempt to commit armed robbery (Count 4), aggravated assault of Morris (Count 5), possession of a firearm during the commission of a felony (Count 6), and theft by receiving stolen property (Count 7). Pender, Whitaker, Dixon, and Wells were also indicted for armed robbery (Count 8) and the aggravated assault of Sergio Mayfield (Count 9). Pender, Dixon, and Wells were indicted for possession of a firearm during the commission of a felony (Count 10). Pender was also charged individually with one count of making a false report of a crime (Count 13) and one count of making a false statement (Count 14). Counts 11, 12, and 15 to 18 pertained only to Dixon, Fair, and Wells.

Dixon pled guilty to voluntary manslaughter and testified at trial as a witness for the State. His case is not part of this appeal.

Pender, Whitaker, Fair, and Wells were tried jointly from February 29 to March 16, 2016. A jury found Pender not guilty on Counts 1 and 10 and was unable to reach a verdict on Counts 8 and 9 as to Pender. The jury found Whitaker not guilty on Counts 1, 8, and 9. Pender and Whitaker were both found guilty on Counts 2 through 7. Pender was also found guilty on Counts 13 and 14.

Fair was found not guilty on Counts 1, 11, and 12. As to Counts 2 through 7, the jury was not able to reach a verdict as to Fair. Wells was found not guilty on Count 1 but guilty on Counts 2 through 10 and 15, for which he was sentenced to life imprisonment without parole for felony murder and additional

2

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. Klaus Winklmaier owned a Ford F-150 truck, which he drove to work. On September 16, 2013, at about 3:00 a.m., he took a break from his work on a night shift and noticed that his truck was gone. He found a pile of broken glass near where he had parked the truck and called the police to

sentences for the remaining charges that did not merge. The trial court entered an order of nolle prosequi on Counts 17 and 18. This Court affirmed his convictions and sentences. See *Wells v. State*, 307 Ga. 773 (838 SE2d 242) (2020). Wells's and Fair's cases are not part of this appeal.

On April 5, 2016, the trial court sentenced Pender to life in prison on Count 2, a concurrent term of imprisonment of 30 years on Count 4, a concurrent term of imprisonment of 20 years on Count 5, terms of 5 years each on Counts 6 and 7 to be served consecutively to Count 2, and terms of 12 months on Count 13 and 5 years on Count 14, to be served concurrently with Count 2. The same day, the trial court sentenced Whitaker to life in prison on Count 2, a concurrent term of imprisonment of 30 years on Count 4, a concurrent term of imprisonment of 20 years on Count 5, and terms of 5 years each on Counts 6 and 7 to be served consecutively to Count 2. As to both Pender and Whitaker, Count 3 merged with Count 2 for sentencing.

Pender filed a motion for new trial through new counsel on April 18, 2016, which he amended through his current appellate counsel on January 10, 2020. Following a hearing, the trial court denied Pender's motion on March 4, 2020. Pender filed a notice of appeal on March 10, 2020. His case was docketed to this Court's August 2020 term and was orally argued on November 4, 2020. Whitaker filed a motion for new trial through trial counsel on April 13, 2016. Through new counsel, Whitaker filed amended motions for new trial on August 25 and November 5, 2019. Following a hearing, the trial court denied Whitaker's motion on February 19, 2020. Whitaker filed a notice of appeal on February 20, 2020, and his case was docketed to this Court's August 2020 term and submitted for a decision on the briefs. These cases have been consolidated for opinion.

report that the truck had been stolen.

The police later interviewed Deandre Williams in connection with the theft of the truck. In the interview, Williams stated that he threw a rock through the truck's window, rummaged through the truck, and found the keys. Pender was with him at the time. Pender later had the keys to the truck.

As set forth in this Court's opinion when it considered the appeal of co-defendant Tyrecquiss Wells, the evidence also showed that

> [o]n September 19, 2013, [Pender, Whitaker, Wells, and Jaylin Dixon] planned to rob Sergio Mayfield. Whitaker arranged a meeting with Mayfield on the pretense of purchasing some marijuana. Wells drove Dixon and Pender toward Mayfield's residence in [the] Ford F-150 that . . . had [been] stolen a few days earlier.[2] Dixon was armed with an AR-15 rifle that Wells had provided, while Pender had a .45-caliber pistol. On the way, the men saw Mayfield driving his vehicle and followed him to his house. Once there, Dixon and Pender quickly exited the truck and approached Mayfield. Dixon pointed his gun at Mayfield's face and demanded that Mayfield "give it up." Mayfield gave Dixon and Pender about $400, but when Mayfield flinched, Dixon and Pender began shooting, hitting Mayfield in the stomach. Mayfield sped off in his

---

[2] Dixon testified at trial that Whitaker did not join this group because Mayfield would have recognized him.

4

vehicle, ended up at a hospital, and survived the shooting.

Dixon and Pender returned to the truck, and Wells drove them to meet up with Whitaker and Donald Fair. Wells proposed that the group rob a gambling house, and the other four agreed. Dixon drove the group in the stolen Ford F-150. Wells had a 9mm pistol with an extended magazine clip, Pender still had the .45-caliber pistol, Fair had the AR-15 that was used to shoot Mayfield, and Whitaker had a Jimenez 9mm pistol. A few blocks from the gambling house, Wells instructed Dixon to block a white Chevy Impala that was occupied by David Scott and Eric Morris. Once the truck stopped, Wells exited the truck, approached the driver's side of the Impala, pointed his gun at the car, and demanded that Scott and Morris get out. Scott, who was driving the Impala, attempted to flee in reverse, at which point Wells, Pender, Whitaker, and Fair began firing at the vehicle. Scott was struck multiple times and crashed into a tree; he died as a result of a gunshot wound to the head. Wells and the rest of his group fled and later set the stolen truck on fire.

Dixon was later arrested and gave a statement to the police after waiving his rights. Dixon confessed to his role in the two shootings, and helped the police apprehend Wells by calling Wells to ask for a ride. Officers had been at an apartment complex from which Wells's cell phone was pinging, and had received reports that Wells had been driving a grey Chevy sedan. After Dixon made the call, officers followed Wells and attempted to conduct a traffic stop, but Wells fled and led officers on a high-speed chase. Wells abandoned his vehicle and was ultimately apprehended. Police found a bag in the vehicle containing a black ski mask. About the same time, Latisa Murray called to report that the vehicle had been stolen. Murray

5

said that she lent the car to Wells but he never returned, and that she sometimes let him stay at her apartment.

Officers obtained Murray's consent to search her apartment, and during the search recovered another black ski mask and an empty box of Winchester .223 caliber ammunition that was consistent with the brand and caliber of some of the rounds found at the scene of the Scott shooting. Murray said that these items belonged to Wells. Police also searched Wells's residence and found an AR-15 rifle and several rounds of Blazer 9mm ammunition, which was the brand and caliber of other ammunition recovered from the Scott shooting.

After being advised of his *Miranda*[3] rights and waiving them, Wells told police that he was present for the Mayfield shooting. He claimed that he thought they were there only to buy marijuana, not rob Mayfield. Wells denied participating in or being present for the Scott shooting.

*Wells v. State*, 307 Ga. 773, 774-775 (838 SE2d 242) (2020). Wells also told the police that he knew Pender because they had lived in the same neighborhood.

During the encounter in which Scott was shot and killed, Pender suffered a gunshot wound, and Whitaker and Wells drove him to the hospital. The police interviewed Pender at the hospital

---

[3] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

6

later that evening, and he claimed that he had been shot at a gas station but could not identify the shooter. The officers who interviewed Pender at the hospital testified that there was no other evidence that a shooting had occurred at the gas station Pender described.

After giving these statements, Pender was arrested. Whitaker was also arrested several days later. After receiving *Miranda* warnings and signing waivers of their rights, Pender and Whitaker gave separate custodial interviews to the police.[4]

Over the course of two interviews, Pender admitted that he and Williams had planned to steal a truck to use during future robberies, that he was involved in the theft of the F-150 truck, and that he was in that truck in the neighborhood where the shootings occurred earlier in the day to burglarize a gambling house. He claimed that Dixon accidentally shot him while playing with a gun. Pender initially told the police that he did not know Wells but later admitted

---

[4] Fair turned himself in to the police and was later interrogated. He denied any involvement in the crimes.

knowing him. Pender told the police that he initially lied about who shot him to protect his friends.

During his interview, Whitaker admitted calling Mayfield about two hours before the shooting to set up a deal to buy marijuana. He also admitted being in the Ford F-150 during the Scott shooting. He admitted having a gun at the time but denied that he fired it.

A firearms expert testified that the police recovered .45-caliber, .223-caliber, and 9mm cartridges and bullet fragments from the crime scenes and during the autopsy of Scott. Each of the .45-caliber bullets was fired from a single weapon, and each of the .223-caliber bullets was fired from a single weapon.

(a) Pender argues that the evidence presented at trial was insufficient to support the jury's verdict as to the charge of theft by receiving the F-150 truck. He argues that the only evidence of his knowledge that the truck had been stolen was his statement confessing to stealing the truck himself and that there was no evidence that he subsequently received stolen property. We

8

disagree.

OCGA § 16-8-7 (a) provides:

A person commits the offense of theft by receiving stolen property when he receives, disposes of, or retains stolen property which he knows or should know was stolen unless the property is received, disposed of, or retained with intent to restore it to the owner. "Receiving" means acquiring possession or control or lending on the security of the property.

Count 7 of the indictment charged Pender, Dixon, Fair, Wells, and Whitaker as parties to the crime of retaining stolen property — a 2003 Ford F-150 truck — which they knew to be stolen, and without the intent to restore it to its owner.

The State presented evidence at trial that Pender admitted "being involved in the theft of the truck" and that he and Williams had planned to steal a truck that could be used to commit other robberies. The State also presented evidence that Williams admitted to the police that "he was the one who stole the [truck,] . . . him and [Pender]." The detective who interviewed Williams testified that Williams admitted smashing the truck's window and retrieving the keys from inside the truck and that Pender was present when this

9

occurred. Pender was later in possession of the keys to the truck on the day of the shootings.

Based on the statements Williams and Pender made to the police and evidence of Pender's possession of the truck, the jury was authorized to determine that Pender was guilty of theft by receiving. The evidence authorized the jury to determine that Pender knew or should have known that the truck was stolen and that he retained the truck with no intention of returning it to its owner. See *Middleton v. State*, 309 Ga. 337, 344-345 (3) (846 SE2d 73) (2020) (discussing statutory requirement of knowledge that property was stolen). Cf. *Sharpe v. State*, __ Ga. __ (850 SE2d 54, 57 (1)) (2020) (evidence was insufficient where State presented evidence of possession of stolen item but no evidence from which the jury could infer that defendant knew or should have known that item was stolen).

Nevertheless, Pender argues that his conviction for theft by receiving cannot stand under *Phillips v. State*, 269 Ga. App. 619, 631 (10) (604 SE2d 520) (2004), because there was direct evidence that

10

he was one of the original thieves of the truck. But as the Court of Appeals has held, "[i]t is not a requirement of the present [theft by receiving] law that the State prove [Pender] did not steal the [truck]." *Weidendorf v. State*, 215 Ga. App. 129, 130 (1) (449 SE2d 675) (1994). Although the evidence presented at trial would have authorized the jury to determine that Williams and Pender acted together to steal the truck, Pender was not charged in this case with theft by taking or any other offense targeted at the original or principal thief of stolen property. Even if he had been so charged, Pender could not have been convicted of both theft by taking and theft by receiving the same stolen property under the facts of this case. See id. at 130 (1); see also *Middleton*, 309 Ga. at 342-348 (3); *Thomas v. State*, 261 Ga. 854, 855 (1) (413 SE2d 196) (1992).

*Phillips* and similar decisions of the Court of Appeals, see, e.g., *Marriott v. State*, 320 Ga. App. 58, 60-63 (1) (739 SE2d 68) (2013); *Fields v. State*, 310 Ga. App. 455, 456-457 (1) (714 SE2d 45) (2011), purport to apply the principle that when there is direct evidence that the defendant was the original or principal thief of the stolen

property, he cannot be convicted of theft by receiving that property.

Those opinions appear to trace back to this Court's 1992 decision in *Thomas*, in which we held that the same person could not be convicted of both robbery of a vehicle and theft by receiving that vehicle because such offenses are mutually exclusive when based on the same stolen property. See *Thomas*, 261 Ga. at 855 (1). We noted in *Thomas* that where a defendant is charged with both robbery and theft by receiving, the jury "must be instructed that it can convict of either (where the evidence so authorizes . . .), but not both." Id. at 855 (2).[5] The decisions of the Court of Appeals are correct to the extent they follow *Thomas* and hold that a defendant cannot be

---

[5] The Court of Appeals appears to have extrapolated from *Thomas* and its own decision in *Duke v. State*, 153 Ga. App. 204, 204-205 (264 SE2d 721) (1980), that appellate courts should overturn a jury's guilty verdict on a theft-by-receiving charge where there is "direct and uncontested" evidence that the defendant was the original thief of the stolen property. See, e.g., *Marriott*, 320 Ga. App. at 61 (1). Moreover, although *Duke* suggested that theft by taking could be considered an included offense of theft by receiving in some cases, see 153 Ga. App. at 205, later in the same year *Duke* was decided, the Court of Appeals held that

> [t]heft by receiving is not a lesser included offense of theft by taking. They are two completely different crimes, having different elements, and are, in fact, so mutually exclusive that the thief and the receiver cannot even be accomplices.

*Sosbee v. State*, 155 Ga. App. 196, 196 (270 SE2d 367) (1980).

convicted of both offenses arising from the same stolen property. See also *Middleton,*309 Ga. at 342-348 (3).

However, we read *Phillips* and similar decisions of the Court of Appeals to be conflating two related, but distinct, roles for a court in reviewing the evidence presented at trial. Trial courts must instruct juries that they cannot simultaneously convict a defendant of both theft by taking and theft by receiving, and a new trial must be granted when a defendant is convicted of two offenses that are mutually exclusive. See *Middleton*, 309 Ga. at 348 (3); *Thomas*, 261 Ga. at 855 (2).[6] But that is distinct from a court's role in reviewing the sufficiency of evidence under *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). Under *Jackson*, the court determines only whether the evidence presented at trial authorized

_____

[6] In the context of a mutually exclusive verdicts analysis, we stated in *Middleton* that a conviction for theft by receiving "necessarily entails a finding that the defendant was not the principal thief[.]" 309 Ga. at 346 (3). But that analysis was dependent on the jury having found the defendant guilty of both theft by receiving and a mutually exclusive offense — in that case, hijacking a motor vehicle. See id. When the problem of mutual exclusivity is absent, courts need determine only whether the State offered evidence that supports the jury's verdict. A jury need not make any affirmative finding about the identity of the principal thief when the only relevant charge is theft by receiving.

13

the jury's verdict, viewing all of the evidence presented in the light most favorable to that verdict. See id. at 319 (III) (B). And where, as here, the defendant is found guilty of only one of two mutually exclusive offenses, it does not matter that the evidence would have also authorized the jury to return a guilty verdict on the other offense. See *Thomas*, 261 Ga. at 855 (2).

A conviction for the offense of theft by receiving, as set forth in OCGA § 16-8-7 (a), requires competent evidence that the defendant received, disposed of, or retained stolen property and knew or should have known that the property was stolen. A lack of intent to restore the property to its rightful owner can be demonstrated by direct evidence or inferred from the circumstances. See *Sharpe*, 850 SE2d at 57 (1). The State is not required to also prove that the defendant was not the person who stole the property. See *Weidendorf*, 215 Ga. App. at 130 (1). Nor is the presence of evidence, whether direct or circumstantial, sufficient to support a conviction for theft by taking fatal to a conviction for theft by receiving. See *Thomas*, 261 Ga. at 855 (2).

This Court appears to have applied the correct analysis in *Lewis v. State*, 287 Ga. 210, 211 (1) (695 SE2d 224) (2010), although not expressly. There, in determining that the evidence presented on a theft-by-receiving charge was sufficient under *Jackson*, we recited direct evidence indicating that certain property, a gun, was stolen from a person who lived in the same apartment complex as the defendant and that the defendant was later found to be in possession of that gun. See id. Other testimony indicated that the defendant had "gotten" the gun from someone in his apartment complex. Id. Our analysis of the sufficiency of the evidence presented as to the theft-by-receiving charge in that case did not appear to impose any requirement on the State to show that someone other than the defendant stole the gun, because our summary of the evidence presented in *Lewis* actually suggests that the defendant may have been the person who stole the gun from its owner. See id. That evidence would, of course, allow the jury to infer that the defendant knew that the gun in his possession was stolen.

Applying these principles, we clarify that, for purposes of

15

reviewing the sufficiency of the evidence presented at trial under *Jackson v. Virginia*, a court need not determine whether the evidence presented supports a finding that the defendant was *not* the principal thief of the stolen property to uphold a jury's guilty verdict as to a theft-by-receiving charge. See *Lewis*, 287 Ga. at 211 (1); *Weidendorf*, 215 Ga. App. at 130 (1). In cases where a defendant is charged with both theft by taking and theft by receiving, the trial court should clearly instruct the jury that it cannot find the defendant guilty of both offenses based on the same conduct. However, where, as here, the defendant is only charged with theft by receiving, a court reviewing the sufficiency of the evidence presented as to that charge need only determine whether the evidence presented at trial, viewed in the light most favorable to the verdict, supports the jury's guilty verdict as to that charge — not whether the evidence excludes the possibility that the defendant was the principal thief of the stolen property. To the extent decisions of this Court or the Court of Appeals can be read to hold otherwise, they are hereby disapproved.

16

Based on the foregoing, the evidence presented at trial supported each element of the offense of theft by receiving, as set forth in OCGA § 16-8-7 (a). The evidence was therefore sufficient to authorize a rational jury to find Pender guilty of that offense. See *Jackson*, 443 U. S. at 319 (III) (B); see also *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

(b) Pender has not challenged the legal sufficiency of the evidence presented as to the remaining counts of which he was convicted — felony murder of Scott, criminal attempt to commit armed robbery, aggravated assault of Morris, possession of a firearm during the commission of a felony, making a false report of a crime, and making a false statement. However, in accordance with this Court's soon-to-end practice in appeals of murder cases,[7] we have

---

[7] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the

17

reviewed the record and determined that the evidence, as summarized above, was sufficient to enable a rational trier of fact to find Pender guilty beyond a reasonable doubt of the other crimes of which he was convicted. See *Jackson*, 443 U. S. at 319 (III) (B).

(c) Likewise, Whitaker has not challenged the sufficiency of the evidence presented as to the crimes of which he was convicted — felony murder of Scott, criminal attempt to commit armed robbery, aggravated assault of Morris, possession of a firearm during the commission of a felony, and theft by receiving. As with Pender, we have reviewed the record and determined that the evidence, as summarized above, was sufficient to enable a rational trier of fact to find Whitaker guilty beyond a reasonable doubt of these crimes. See *Jackson*, 443 U. S. at 319 (III) (B).

2. Pender argues that the trial court erred by admitting several statements from non-testifying co-defendants through the testimony of a detective, in violation of *Bruton*. Specifically, Pender argues that

term of court that began in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (4) (846 SE2d 83) (2020). The Court began assigning cases to the December Term on August 3, 2020.

18

the trial court should have excluded a statement made by Wells that he knew Pender from the neighborhood and statements by Whitaker about who was in the truck during the shootings. Pender also argues that his trial counsel provided ineffective assistance because counsel did not object to the redacted versions of Whitaker's statements introduced at trial.

Before trial, each co-defendant objected to the admission of the other co-defendants' statements to the police under *Bruton*. The trial court ruled that redacted versions of the statements given by Wells and Whitaker could be admitted through the testimony of a detective.[8]

(a) The detective testified that Wells told him that he knew Pender and that they had lived in the same neighborhood. Pender argues that this statement directly incriminated Pender in the false-statement charge, which was based on Pender's statement to the police that he did not know Wells.

---

[8] Pender does not argue here that the co-defendants' statements were inadmissible hearsay, so we do not address that question.

"A defendant's Sixth Amendment right to be confronted by the witnesses against him is violated under *Bruton* when co-defendants are tried jointly and the testimonial statement of a co-defendant who does not testify at trial is used to implicate [another] co-defendant in the crime." (Citation omitted.) *Floyd v. State*, 307 Ga. 789, 797 (2) (837 SE2d 790) (2020). However, "*Bruton* excludes only the statement of a non-testifying co-defendant that standing alone directly inculpates the defendant." *McLean v. State*, 291 Ga. 873, 875 (3) (738 SE2d 267) (2012). "*Bruton* is not violated if a co-defendant's statement does not incriminate the defendant on its face and only becomes incriminating when linked with other evidence introduced at trial." (Citation omitted.) *Taylor v. State*, 304 Ga. 41, 45 (2) (816 SE2d 17) (2018).

In isolation, a person's mere statement that he knows a defendant does not typically implicate the defendant in a crime. Where, however, the charged crime is that the defendant made a false statement to law enforcement indicating that he did not know that person, the statement by the person that he does know the

defendant is the core of the charged offense and facially and directly implicates the defendant in the crime. Thus, the admission of Wells's statement that he knew Pender violated *Bruton* because there was no need to connect this statement with other evidence in order to make it incriminating.

> However, this error was harmless beyond a reasonable doubt.

> In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the [non-testifying co-defendant's] admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.

(Citations and punctuation omitted.) *Collum v. State*, 281 Ga. 719, 721-722 (2) (642 SE2d 640) (2007). "A *Bruton* violation may not be prejudicial when the complained-of statements are substantially similar to evidence properly admitted at trial." *Battle v. State*, 301 Ga. 694, 700 (4) (804 SE2d 46) (2017).

Here, the jury could have determined that Pender's statement to the police that he did not know Wells was false based on other evidence presented at trial. First, and most significant, after

21

initially claiming that he did not know Wells, Pender later admitted knowing Wells. In addition, Dixon, who was thoroughly cross-examined by each co-defendant, testified about Pender's and Wells's roles in the shootings, including instances in which the two were together. Thus, the evidence that Pender's statement about not knowing Wells was false was overwhelming, and the prejudicial effect of Wells's statement to the police was minimal by comparison. Accordingly, we conclude that it is clear beyond a reasonable doubt that this *Bruton* violation was harmless. See *Mason v. State*, 279 Ga. 636, 638 (2) (b) (619 SE2d 621) (2005) (*Bruton* error was harmless where "essentially identical" statement as that made by non-testifying co-defendant was in evidence without objection by the defense).

(b) Pender also argues that the trial court should have excluded the detective's testimony about statements Whitaker made to the police and the redacted version of a diagram Whitaker drew of the scene of the Scott shooting. Pender asserts that, considered together, those statements and the diagram incriminated Pender by placing

him in the Ford F-150 truck at the time of the Scott shooting. We disagree that the admission of Whitaker's statements and the redacted diagram violated *Bruton*.

The detective testified that Whitaker said that on September 19, 2013, the day of the shootings, Dixon, Wells, and Pender came to his neighborhood in a truck. Whitaker told the detective that he drove Pender to the hospital to be treated for a gunshot wound and stayed with Pender for a short time.

Later, Whitaker told the detective that he had not been involved in the Scott shooting and denied being with Dixon. Then, without identifying who else was in the truck at the time, Whitaker admitted to the detective that he had been in the truck earlier in the day, that the "vibe of the group" was "that they were planning on doing something illegal," and that he did not want to be part of that. Whitaker again denied any involvement in the Scott shooting.

The detective testified that Whitaker later admitted he had been in the truck at the time of the Scott shooting. At that point in his interview, Whitaker drew a diagram of the intersection where

23

the Scott shooting took place, a redacted version of which was shown to the jury. The detective testified that, as Whitaker was drawing the diagram, he told the detective that Dixon was driving the truck and that he was seated behind Dixon.[9] Whitaker then described the shooting, but denied firing a gun that Dixon had given him. Whitaker told the detective that he had no idea "they" were going to shoot or rob anyone and then told the detective that there were six people in the truck, including himself and Dixon. Whitaker then identified some of the guns that he had seen in the truck in photographs found in Dixon's cell phone.

After talking about the guns, the detective asked Whitaker "why he thought they were getting the truck." Whitaker replied that he thought "they" were "getting into the truck to go handle their issues" with some people from a different neighborhood but ended

---

[9] The diagram included the layout of the truck and showed Dixon as the driver and Whitaker sitting behind Dixon when the truck blocked Scott's path just before the shooting occurred. The original version of the diagram also showed where Wells and Pender were located in the truck. Pursuant to the co-defendants' joint *Bruton* motion, references on the diagram to Wells and Pender were redacted, and the testimony of the detective who interviewed Whitaker was limited to the involvement and location of Whitaker and Dixon.

up in the intersection where the Scott shooting occurred. Whitaker told the detective that the issues involved a series of previous incidents in which Fair had been involved in a fight, Dixon had been shot, and a window in Whitaker's vehicle had been smashed.

Whitaker then told the detective that he learned that the truck he was in during the Scott shooting had later been burned but that "he didn't know anything else because he was at the hospital with Pender." Whitaker then stated that after the Scott shooting, "they" went back to their neighborhood and then he went to the hospital with Pender.

Pender argues that these statements and the redacted diagram, considered together, directly placed each co-defendant, including Pender, in the truck during the shooting of Scott. He argues that *Bruton* was violated because the jury was not required to infer that Pender participated in the shooting when Whitaker's statements placed Pender in the truck before, during, and after the shooting. Pender also argues that the trial court should have excluded the redacted version of the diagram. He argues that it

would be unusual for a single passenger in a truck to be seated directly behind the driver and that the limited information given to the jury about this seating arrangement implied that others were also in the truck — namely, the other co-defendants, including Pender.

However, considered together, Whitaker's statements and the redacted diagram did not directly implicate Pender in any crime. Whitaker initially told the detective that a truck with Dixon, Wells, and Pender inside came to his neighborhood on the day of the shootings. But he never specified when that event occurred. That statement, standing alone, does not implicate Pender in any crime. Likewise, the references to Pender being shot and Whitaker taking Pender to the hospital do not implicate Pender in any crime. Whitaker's statements were vague as to the circumstances and timing of Pender's shooting and indicated only that Whitaker took Pender to the hospital after returning to the neighborhood from the Scott shooting.

Moreover, Whitaker's statements that "they" went to settle

business with people from a different neighborhood and that "they" returned to the neighborhood after the shooting do not necessarily implicate Pender. The first statement seems to refer back to an earlier statement about Whitaker, Dixon, and Fair having previous troubles with men from another neighborhood. The detective's testimony about Whitaker's statements never mentioned Pender in the context of those difficulties or in relation to the confrontation that Whitaker, Dixon, and Fair had planned.

The latter reference to "they" was made by Whitaker to the detective in the context of the diagram Whitaker drew of the Scott shooting. Based on our review of the redacted exhibit, it would not have been evident to the jury that redactions were made. Moreover, nothing in the redacted diagram shown to the jury or the detective's testimony about the diagram indicated that Pender was in the truck at the time of the Scott shooting. Rather, the fact of Pender's presence in the truck at the time depicted in the diagram could only be determined by inference or from other evidence presented by the

State, most prominently Dixon's testimony.[10] Viewed in that context, Whitaker's statement, as related by the detective, strongly implied that "they" included Whitaker and Dixon, the only two people in the truck who were identified in Whitaker's statements and the redacted diagram of the truck at the time of the Scott shooting. Whitaker's use of "they" did not identify anyone else who may have been in the truck at the time. See *McLean*, 291 Ga. at 875-876 (3) (co-defendant's statement that "they" threw a firearm out of a vehicle did not necessarily refer to defendant because "they" were never identified and the remainder of the co-defendant's statement

---

[10] *Bruton* violations can be avoided through careful redaction of documents, photographs, and prior statements, but those redactions must not signal to the jury that the redaction replaces an obvious reference to a co-defendant. See *Floyd*, 307 Ga. at 797 (2) (noting that a *Bruton* violation was avoided where witness was instructed to omit references to appellant's involvement in the crimes when testifying about statements made by co-defendant); *Taylor*, 304 Ga. at 45 (2) (noting redaction of references to appellant in evidence presented to jury to avoid a *Bruton* violation). Cf. *Simpkins v. State*, 303 Ga. 752, 755 (II) (814 SE2d 289) (2018) (noting that *Bruton* applies when the co-defendant's statement is redacted by replacing a defendant's name with "an obvious blank, the word 'delete,' [or] a symbol," so as to "notify the jury that a name has been deleted," because statements redacted in that way still facially incriminate a defendant to whom they obviously refer) (citing *Gray v. Maryland*, 523 U. S. 185, 195-196 (III) (118 SCt 1151, 140 LE2d 294) (1998)); *Ardis v. State*, 290 Ga. 58, 60-62 (2) (a) (718 SE2d 526) (2011) (*Bruton* violation occurs when, despite redactions, it is "obvious" from context of co-defendant's statement that testimony references defendant).

referred only to himself). Those statements only became incriminating with respect to Pender when linked with other evidence about Pender's involvement in the crimes. See id.

Finally, Pender takes issue with Whitaker's statement indicating that there were six people in the truck at the time of the Scott shooting. However, in addition to naming a larger number of people than had even been charged with crimes relating to this incident, the statement did not name, refer to, or describe Pender. Nor had any part of the detective's testimony about Whitaker's statement referenced Pender, other than, as noted above, to indicate that Whitaker had seen Pender in a truck at some point on the day of the shootings and that Whitaker had taken Pender to the hospital to be treated for a gunshot wound after Whitaker returned from the Scott shooting. See *Simpkins*, 303 Ga. at 756 (II) (no *Bruton* violation where co-defendant's statement referenced multiple unnamed assailants and the State did not clearly and contemporaneously link the defendant with the omitted names of the assailants).

In sum, the efforts to redact the diagram drawn by Whitaker and to limit the detective's testimony about Whitaker's statements avoided a *Bruton* violation because neither the diagram nor Whitaker's statements, considered in total, directly implicated Pender in any crime or placed him in the truck during the Scott shooting. Thus, we see no error in regard to the trial court's admission of the redacted diagram or the detective's testimony about Whitaker's statements.

(c) Although Pender objected to the admission of the diagram and Whitaker's statements to the police before trial, which resulted in only limited and redacted versions of the diagram and those statements being presented to the jury, Pender now claims that his trial counsel provided constitutionally ineffective assistance by not objecting to the admission of the redacted form of the diagram or the testimony actually offered by the detective at trial about Whitaker's statements. Pender argues that even with the redactions to the diagram and the efforts made at the court's direction to limit the testimony of the detective about Whitaker's statements, *Bruton* was

still violated. However, as we have determined that the admission of the redacted diagram and Whitaker's statements through the detective's testimony did not violate *Bruton*, this claim is meritless. See *Thomas v. State*, 300 Ga. 433, 440 (2) (a) (3) (796 SE2d 242) (2017) (failure to make a meritless objection does not constitute ineffective assistance of counsel).

3. Pender argues that the trial court plainly erred when it allowed the investigating officer to provide testimony that bolstered statements made by the co-defendants, in violation of OCGA § 24-6-620, which provides in part that "[t]he credibility of a witness shall be a matter to be determined by the trier of fact." We disagree that the trial court plainly erred.

When reviewing evidentiary rulings to which the appellant did not object at trial, we apply the following standard:

> First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary

31

case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citations and punctuation omitted.) *Gates v. State*, 298 Ga. 324, 327 (3) (781 SE2d 772) (2016). See also OCGA § 24-1-103 (d) ("Nothing in this Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court.").

Here, Pender argues that the trial court should not have permitted the detective to testify about the interrogation tactic of "bluffing" and how he employed it while questioning the co-defendants, including Pender. In his testimony, the detective stated that when an interrogator bluffs, "individuals who are oftentimes lying will fabricate a story to make the evidence fit their story. Someone who isn't lying will generally just adamantly deny the fact that the evidence exists." The detective then testified that, in the course of his interrogation, he told Pender that Pender's blood had

32

been found in the truck. According to the detective, Pender then "began to tailor his story to fit why his blood would be in the [cab of the truck]." The detective then detailed Pender's story about the blood. The detective testified that he "bluffed" Pender again by telling him that he had video recordings from the area of the Mayfield shooting showing Pender and that Pender's blood had been found near the intersection where Scott was shot. In response to these bluffs, Pender told the detective that "if he were going to rob someone, he'd be smart enough to wear a mask" and that he had been near the intersection where Scott was shot earlier in the day and had fallen in the intersection after cutting his hand on a fence. The detective testified that Pender had no new injuries on his hands or arms.

The detective later compared Pender's statements, specifically the timeline of events on the day of the shootings, with the timelines described by Dixon and Fair and commented on Fair's demeanor during his interrogation. The detective also testified that some of Whitaker's statements about the Scott shooting were consistent

33

with Dixon's and that, in his investigation, he had compared statements made by the co-defendants in their interviews with the physical evidence collected from the crime scenes and elsewhere.

As an initial matter, we note that of the five charged assailants, only Dixon testified at trial after he pled guilty and agreed to cooperate with the State. Pender, Whitaker, Wells, and Fair did not testify. In *Sawyer v. State*, 308 Ga. 375, 382 (2) (a) (839 SE2d 582) (2020), we noted that we could locate "no authority for the proposition that OCGA § 24-6-620 applies where a defendant does not testify at trial and is therefore not a witness." In *Sawyer*, in the context of a claim of ineffective assistance of counsel, we placed no burden on counsel to anticipate and raise a novel legal argument concerning the application of OCGA § 24-6-620 to co-defendants who do not testify at trial. Likewise, because we did not resolve the issue in *Sawyer* or any previous decision interpreting OCGA § 24-6-620, we cannot say that the trial court made a clear and obvious legal error by allowing the detective to testify about statements made by individuals who did not testify at trial. Thus, as to any testimony of

the detective regarding statements made by Pender, Whitaker, Wells, and Fair, the trial court committed no plain error.

Dixon, on the other hand, testified at trial and was clearly a "witness" within the meaning of OCGA § 24-6-620. Thus, the detective was not permitted under OCGA § 24-6-620 to bolster Dixon's testimony. However, "[w]hen a witness's statement does not directly address the credibility of another witness, . . . there is no improper bolstering." *Brown v. State*, 302 Ga. 454, 460-461 (2) (b) (807 SE2d 369) (2017).

Here, Pender complains that the detective compared Dixon's statements to those given by Pender and Fair and that he later characterized Dixon's statements as being consistent with Whitaker's. While it would have been improper for the detective to testify about whether he believed Dixon was telling the truth, it was permissible for the detective to discuss whether Dixon's statements to him (and, by implication, Dixon's testimony at trial) were consistent with other information he had received in the course of his investigation, including statements made by other suspects in

35

the crimes. See *Davis v. State*, 306 Ga. 140, 147 (3) (f) (829 SE2d 321) (2019).

Moreover, even though the detective's testimony about "bluffing" Pender indicated that Pender tailored responses to the detective's suggestions that his blood had been found and that he had been seen on video, that line of questioning went solely to Pender's concocted stories in response to those statements by the detective. The detective's testimony about his questioning of Pender on this topic never directly implicated Dixon's credibility because the detective never suggested that he had ever asked Dixon about the statements Pender made in response to the bluffs. Even though the detective's trial testimony later compared some of the statements made by Pender and Dixon, such comparisons "did not speak directly to [Dixon's] truthfulness," because it appears those comparisons were made about their statements on other issues. See *Davis*, 306 Ga. at 147 (3) (f). Rather, the "testimony was responsive to questions about the manner in which the detective conducted his investigation and whether that investigation produced other

36

evidence that was consistent with information provided by [Dixon]."

*Abney v. State*, 306 Ga. 448, 455 (3) (b) (831 SE2d 778) (2019). Such

testimony "does not constitute improper bolstering." Id. Thus, the

trial court did not plainly err by permitting the detective to compare

the statements given by Dixon with those of Pender and the other

co-defendants. This enumeration of error fails.

4. Pender also argues that the trial court plainly erred when it

permitted the State's firearms expert to testify that her work in the

case had been "successfully" peer reviewed. Pender first argues that

this testimony should have been excluded because it contained

inadmissible hearsay and violated the Confrontation Clause of the

Sixth Amendment to the United States Constitution.[11] He also

argues that this testimony constituted improper bolstering.

(a) We first consider Pender's argument that the witness's

---

[11] We note that Article I, Section I, Paragraph XIV of the Georgia Constitution of 1983 also provides, in relevant part, that "[e]very person charged with an offense against the laws of this state . . . shall be confronted with the witnesses against such person." However, because Pender has only raised a claim under the Confrontation Clause of the Sixth Amendment with respect to the expert's testimony, we limit our review to that claim.

37

statements violate the hearsay rule and the Confrontation Clause. Because Pender did not object to the admission of the statements on these grounds at trial, we review these claims only for plain error. See OCGA § 24-1-103 (d); see also *Kemp v. State*, 303 Ga. 385, 397-398 (3) (810 SE2d 515) (2018) (applying plain error standard of review to the appellant's unpreserved Confrontation Clause claim); *Lupoe v. State*, 300 Ga. 233, 243 (4) (794 SE2d 67) (2016) (applying plain error review to the appellant's unpreserved hearsay claim).

At trial, the State presented a video recording of a deposition given by its firearms expert.[12] During voir dire regarding her qualifications as an expert, the following exchange occurred:

> STATE: In . . . your position, is there an opportunity for you to be peer reviewed?
> WITNESS: Yes, sir. We're peer reviewed on each case that we handle.
> STATE: And what does that mean in lay language?
> WITNESS: Peer review for a firearms examiner means that I have a scientist that, number one, he or she would verify my work. That means that she would put hands on the evidence that I examined, look at my conclusions, and

---

[12] The firearms expert was unavailable to testify during the week of the trial due to overseas travel, and the State and each of the co-defendants agreed before trial to make a video recording of her deposition that could then be played to the jury in lieu of live testimony.

look at any identifications or eliminations that I made. If the verifier agreed with me, then the case was passed to a peer reviewer. If it did not, more work was done. Then the peer review process ensures that all policies were followed, that all evidence examined is documented in the report and everything was documented correctly.

STATE: How many times have you been — your work matter has been peer reviewed in that way?

WITNESS: Each case.

The State later tendered the firearms examiner as an expert in firearms identification, tool mark identification, and ballistics science without objection from the defendants. Later in her testimony, the witness had the following exchange with the prosecutor:

STATE: So are you confident of those findings that you made as a ballistics expert in this case?

WITNESS: Yes sir, I am.

STATE: Was it indeed peer reviewed?

WITNESS: Yes sir, it was.

After discussing her identification and comparisons of several bullet fragments recovered from the crime scene, the following exchange occurred:

STATE: Thank you. And was that peer reviewed as well?

WITNESS: Yes, sir.

STATE: And I hate to ask the same question. Were all of

your results and findings in this same report that we're referring to peer reviewed?
WITNESS: Yes, sir.
STATE: And successfully peer reviewed at that?
WITNESS: Yes, sir.

First, the witness's testimony about the peer-review process and the fact that her work was peer reviewed was not hearsay. The witness merely explained the peer-review process for firearms examinations, with which the witness was personally familiar, and testified that her work had been peer reviewed, a fact also within her personal knowledge. None of her testimony about that process included or restated any out-of-court statement, and thus the trial court did not plainly err by failing to exclude her statements about the peer review process as inadmissible hearsay or under the Confrontation Clause.

Pender raises the same claims regarding the witness's testimony that her work had been "successfully" peer reviewed. But even assuming this one statement by the witness constituted inadmissible hearsay and was "testimonial" within the meaning of the Confrontation Clause as Pender argues, any error in the

40

admission of the statement was not plain error because it had no effect on the outcome of the trial. See *Kemp*, 303 Ga. at 397-398 (3); *Lupoe*, 300 Ga. at 243-244 (4).

In this case, the admission of the isolated statement that the expert's work in identifying and comparing bullet fragments recovered from the crime scenes had been "successfully" peer reviewed was entirely harmless. The evidence presented at trial identifying Pender as one of the assailants and detailing his involvement in the crimes was strong, and the identification of the caliber of bullets found at the crime scenes was not a significant issue in the case as to Pender. Nothing in the expert's testimony directly connected the bullets or the guns that fired them to Pender. Moreover, neither Pender nor any of the other co-defendants made any meaningful challenge to the expert's testimony about her qualifications, the peer review process, or the analysis of the bullet fragments found at the crime scenes and during Scott's autopsy.[13]

---

[13] Only counsel for Wells and Whitaker even cross-examined the expert, and their questions largely gave the witness an opportunity to clarify and

41

We therefore conclude that even if the expert's testimony that her work in this case had been "successfully" peer reviewed constituted inadmissible hearsay and violated the Confrontation Clause, any such error was harmless and therefore did not constitute plain error.

(b) Pender also argues that the witness's statements about the peer review process constituted improper bolstering under OCGA § 24-6-620. However, the witness's testimony contained no statement about her truthfulness. The portions of her testimony that are at issue merely described the peer-review process utilized in firearms examinations and indicated that the process had been completed successfully in this case and each of the other cases in which the witness had conducted firearms examinations. This enumeration of error fails.

5. Before trial, Pender moved to suppress a custodial statement he gave to the police on October 4, 2013, because the law enforcement officers who interviewed him failed to read the

expand upon points she made during the State's direct examination, including about the process she herself utilized to identify the bullets.

*Miranda* warnings to him before that interview. The trial court denied the motion, determining that Pender was properly informed of his *Miranda* rights before an earlier interview eight days before and that he gave the October 4 statement to law enforcement freely and voluntarily. Pender now argues, as he did below, that the trial court erred by admitting the statement because Pender was not specifically re-read his *Miranda* rights. We disagree.

> The trial court determines the admissibility of a defendant's statement under the preponderance of the evidence standard considering the totality of the circumstances. Although we defer to the trial court's findings of disputed facts, we review de novo the trial court's application of the law to the facts.

(Citations and punctuation omitted.) *Ellis v. State*, 299 Ga. 645, 647 (2) (791 SE2d 16) (2016).

The trial court conducted a pre-trial *Jackson-Denno*[14] hearing on Pender's motion to suppress and heard testimony from Officer Gregory Anderson, Detective Katina Williams, and Sergeant Murry Gunderson. Officer Anderson met with Pender on September 19,

---

[14] See *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

43

2013, and Detective Williams met with Pender on September 23, 2013. In both meetings, Pender was still hospitalized with gunshot wounds and was, at the time, considered a victim of the crimes and not a suspect. Neither officer administered *Miranda* warnings to Pender when they spoke with him, and both officers testified that they did not threaten him or make any promises to him in exchange for speaking with them.

Before the September 23 interview, Detective Williams had received a tip that Pender had been shot by Wells and had been with Wells during the Scott shooting. But when Williams spoke with Pender on September 23, Pender denied knowing Wells. Detective Williams testified that, after the interview, she decided that Pender should be placed into custody as a suspect. Although he remained hospitalized, Pender was arrested for making false statements and for filing a false police report.

Pender was next interviewed by Detective Williams and Sergeant Gunderson on September 26, 2013, at the hospital while in police custody. Detective Williams read the *Miranda* warnings to

44

Pender before questioning him, and Pender read and signed a form outlining those rights and indicating that he agreed to speak with the officers. Sergeant Gunderson testified that Pender appeared to understand his rights and that he was lucid and coherent while being interviewed. He did not request an attorney. Detective Williams and Sergeant Gunderson interviewed Pender for approximately 45 minutes. Sergeant Gunderson testified that he did not offer Pender anything in exchange for his statement and did not threaten him.

Eight days later, on October 4, 2013, Sergeant Gunderson and Detective Williams conducted a custodial interview of Pender at a police station immediately after he was released from the hospital. Sergeant Gunderson testified at the *Jackson-Denno* hearing that he told Pender the following at the police station:

> I said you remember how we talked previously about the rights you had, you signed the form and stuff. He said yes. And I said, okay, do you want to still talk to us without your attorney present or do you just need to have them transport you over to the county jail. He said no, I want to talk to y'all. At that point, we put him in an interview room and set up the recording device.

45

Sergeant Gunderson testified that he did not promise anything to Pender in exchange for his statement and did not threaten or coerce him. Sergeant Gunderson further testified about the interview that followed:

> At that point, [Pender], when he had given us three different stories, our patience was pretty thin. We were working on something else. And so if [Pender] was going to sit there and waste our time, we'd just take him to the jail. But he said he wanted to talk. I verbally spoke to him again about his rights and he said, yeah. Oh, I want to tell you what happened. And so we sat him down.

Pender then made a number of self-incriminating statements. Sergeant Gunderson testified about those statements at trial, which were admitted over Pender's objection. Pender now argues that this was error because the statements given on October 4 did not follow the giving of the *Miranda* warnings that day. We disagree.

The evidence presented at the *Jackson-Denno* hearing supported the trial court's findings that *Miranda* warnings had been given to Pender on September 26, that the officers did not threaten Pender or promise anything to him in exchange for his testimony,

and that he appeared to be lucid when they were discussing the rights outlined in the *Miranda* warnings. The record also established that before commencing the interrogation on October 4, Gunderson twice referred to the prior giving of the *Miranda* warnings and the form that Pender had signed. Gunderson also asked Pender if he wanted to have his attorney present before continuing.

Because evidence in the record supports the trial court's finding that Pender made a knowing, intelligent, and voluntary waiver of his rights on September 26, we conclude that the officers were not required to re-read the *Miranda* warnings to Pender before commencing their questioning on October 4. "Neither federal nor Georgia law mandates that an accused be continually reminded of his rights once he has intelligently waived them." (Citation and punctuation omitted.) *Ellis*, 299 Ga. at 648 (2). Moreover, Pender has made no showing that the *Miranda* warnings he received on September 26 became stale in the eight days between receiving them and the incriminating statements he made to the police on October

47

4. See id; see also *United States v. Barner*, 572 F3d 1239, 1244-1245 (A) (11th Cir. 2009) (no need to reiterate *Miranda* rights where accused initiated interview with law enforcement and had been informed of his rights 12 days earlier). To the contrary, the record shows that, before questioning commenced on October 4, he was twice reminded of the *Miranda* warnings and the form he had signed, and he was asked specifically whether he wanted to have an attorney present. Based on the totality of the circumstances, the trial court did not err in its determination that Pender's October 4 statement was freely, knowingly, and voluntarily given or in its admission of the October 4 statement at trial.

6. Pender also argues that the cumulative effect of the trial court's actual and assumed errors in this case prejudiced him. We disagree.

The trial court's errors require reversal of Pender's convictions unless the errors can be deemed harmless. See *Strong v. State*, 309 Ga. 295, 316 (4) (845 SE2d 653) (2020). "In determining whether trial court error was harmless, we review the record de novo, and we

48

weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." (Citation and punctuation omitted.) Id.

We recently held that "Georgia courts considering whether a criminal defendant is entitled to a new trial should consider collectively the prejudicial effect of trial court errors . . . at least where those errors by the court . . . involve evidentiary issues." *State v. Lane*, 308 Ga. 10, 14 (1) (838 SE2d 808) (2020). We determined in Division 2 (a) that the trial court erred by admitting Wells's statement in violation of *Bruton*. We also assumed in Division 4 (a) that testimony by the firearms expert that her work in the case had been "successfully" peer reviewed constituted inadmissible hearsay and violated Pender's rights under the Confrontation Clause.

Both errors implicate Pender's rights under the Confrontation Clause, and, with regard to the expert's testimony about "successful" peer review, Georgia's rules of evidence regarding hearsay. We have yet to decide how multiple standards for assessing prejudice may interact under cumulative review of different types of errors, see

49

*Lane*, 308 Ga. at 21 (4), and again we need not do so here, because Pender's claims of cumulative prejudice fail under even the higher standard implicated by these errors, which requires the State to prove that violations of Pender's right to confront witnesses were harmless beyond a reasonable doubt. See *Ardis v. State*, 290 Ga. 58, 62 (2) (a) (718 SE2d 526) (2011).

First, these errors addressed entirely different issues in the case. Wells's statement about knowing Pender implicated only the false-statement charge, and, as noted above, there was plenty of other evidence from which the jury could have determined that Pender lied to the police when he said he did not know Wells. As explained above, the testimony of the firearms expert concerned the identification of the bullets found at the crime scene and during the autopsy and the weapons from which they had been fired, which was a separate and insignificant issue as to Pender, as none of her testimony directly linked Pender to the bullets or the weapons that fired them. We are therefore persuaded beyond a reasonable doubt that the cumulative effect of these actual and assumed

50

Confrontation Clause errors had no effect on the jury's verdicts in this case. See *Ardis*, 290 Ga. at 62 (2) (a).

7. We now turn to the arguments Whitaker asserts on appeal, He first argues that, in denying his motion for new trial, the trial court deprived him of his constitutional right against self-incrimination by "holding against him" that he did not testify. We disagree that that is what the trial court did in ruling on the general grounds.

The Fifth Amendment to the United States Constitution provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" Embodied within that right is the right of a criminal defendant to elect not to testify in his defense. The United States Supreme Court has held that the Fifth Amendment effectuates this right by barring adverse comment by the prosecution on the defendant's silence and by barring the trial court from instructing the jury that such silence is evidence of guilt. See *Griffin v. California*, 380 U. S. 609, 615 (85 SCt 1229, 14 LE2d 106) (1965). Upon request by the defendant, trial

51

courts are also obligated to instruct the jurors that they may draw no adverse inference from the defendant's election not to testify. See *Carter v. Kentucky*, 450 U. S. 288, 300 (II) (B) (101 SCt 1112, 67 LE2d 241) (1981).

Whitaker challenged the jury's verdicts under OCGA §§ 5-5-20 and 5-5-21, which respectively allow the court to grant a new trial "[i]n any case when the verdict of the jury is found contrary to evidence and the principles of justice and equity," or when "the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding." OCGA §§ 5-5-20 and 5-5-21 "afford the trial court broad discretion to sit as a thirteenth juror and weigh evidence on a motion for new trial alleging these general grounds." (Citation and punctuation omitted.) *Holmes v. State*, 306 Ga. 524, 527 (2) (832 SE2d 292) (2019). "In exercising that discretion, the trial judge must consider . . . any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence." *White v. State*, 293 Ga. 523, 524 (2) (753 SE2d 115) (2013).

In considering the general grounds in its order denying Whitaker's motion for new trial, the trial court outlined the evidence presented at trial, discussed the weight it gave to certain portions of the evidence, and addressed Whitaker's argument that Dixon's testimony should be discounted because it was not credible. The order also considered Whitaker's statement to law enforcement that he had not been aware of the plan to commit the robberies. In so doing, the trial court listed evidence from the record that contradicted Whitaker's statement, which was presented to the jury through the testimony of the police officer who interrogated Whitaker.

The trial court found that Whitaker's statement about his ignorance of the plan was not credible. In explaining why it reached that conclusion, the trial court listed seven reasons. Among them, the trial court noted that "[t]he only evidence supporting [Whitaker's] claim that he was ignorant of the robbery plan is his own self-serving statement, not subject to cross-examination." The court went on to note that it gave more credence to Dixon's

statement to the police than to Whitaker's out-of-court statement to law enforcement about his ignorance of the plan to commit the robberies because Dixon's statement "was strongly corroborated by other evidence and subject to cross-examination, while Whitaker's statement . . . is uncorroborated[,] contradicted by other evidence, and not subject to cross-examination."

Whitaker argues that the trial court's reference to the lack of cross-examination of his statement deprived him of his Fifth Amendment right not to testify at trial because the trial court held it against him that he chose not to subject himself to cross-examination. But these statements in the trial court's order were made in passing and in the context of the court's assessment of the credibility of Whitaker's own self-serving statement to law enforcement and how that statement should be judged against the other evidence presented at trial, including Dixon's cross-examined testimony. Those statements in the trial court's order were not an adverse comment regarding — or adverse inference from — Whitaker's election not to testify. Rather, the statements were part

54

of the trial court's explanation of why it gave more weight to Dixon's testimony, which had been subjected to cross-examination by defense counsel and which was corroborated by other evidence presented at trial, than it gave to Whitaker's self-serving, out-of-court statement to the police. See *State v. Beard*, 307 Ga. 160, 165 (2) (a) (835 SE2d 273) (2019) (noting trial court's detailed evaluation of witnesses' credibility as part of general-grounds analysis, including its assessment of efforts by some witnesses to minimize their role in the crimes); *State v. Denson*, 306 Ga. 795, 800 (2) (b) (833 SE2d 510) (2019) (noting that trial court was authorized to credit one witness's version of events while discounting versions supported by other evidence). This enumeration of error fails.

8. Whitaker also argues that the trial court erred by citing evidence of crimes for which he was found not guilty by the jury as a rationale for denying his motion for new trial on the counts for which he was found guilty. Specifically, Whitaker argues that the trial court should not have cited evidence that he committed Counts 8 and 9, the armed robbery and aggravated assault of Mayfield, in

its general-grounds analysis. We disagree that the trial court abused its discretion.

The State offered evidence, namely through Dixon's testimony, that Whitaker had been involved in the planning and setup of the robbery of Mayfield. Although the jury ultimately acquitted Whitaker for the armed robbery and aggravated assault of Mayfield, the trial court, when considering the general grounds, was free to consider all of the evidence presented at trial.[15] As noted above, in its general-grounds analysis, the trial court appears to have given great weight to Dixon's testimony, especially when compared to the self-serving statements made by Whitaker to the police concerning his involvement in the crimes. Even though the trial court may have given weight to some testimony that the jury discounted, that type of assessment fits comfortably within the trial court's discretion and

---

[15] Whitaker contends that this evidence should not have been considered by the trial court in its general grounds analysis because its constituted character evidence that is inadmissible under OCGA § 24-4-404 (b). But evidence properly admitted as proof of a charged crime as to which the jury acquits a defendant is not somehow retroactively converted into evidence subject to OCGA § 24-4-404 (b). Moreover, evidence of conduct for which the defendant was previously acquitted of a crime may be admissible pursuant to OCGA § 24-4-404 (b). See *State v. Atkins*, 304 Ga. 413 (819 SE2d 28) (2018).

lies at the core of the trial court's role in ruling on the general grounds. See *Beard*, 307 Ga. at 166 (2) (b) (noting that trial court was, contrary to jury's verdict, authorized to discount some testimony and favor other evidence); *Burney v. State*, 299 Ga. 813, 815 (1) (c) (792 SE2d 354) (2016) (noting trial court's ruling on motion for new trial based on its "independent" review of trial record). We thus see no abuse of the trial court's discretion in this case.

*Judgments affirmed. All the Justices concur.*