**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0495
Sheldon Ragland
v.
The State

On Appeal from the DeKalb County Superior Court
No. 21CR15915

Decided: April 21, 2026

PETERSON, Chief Justice.

Sheldon Ragland appeals his convictions related to the shooting death of Kenneth Adair.[1] On appeal, Ragland argues that the trial court erred by: (1) excluding testimony that Derell Richardson, whom Ragland had claimed the police failed to

---

[1] Adair was killed on or about June 11, 2017. In June 2021, a DeKalb County grand jury returned an indictment charging Ragland with malice murder (Count 1), felony murder (Count 2), armed robbery (Count 3), aggravated assault (Count 4), possession of a firearm during the commission of a felony (Count 5), possession of a firearm by a convicted felon (Count 6), and possession of a firearm by a convicted felon during the commission of certain crimes (Count 7). Count 7 was bifurcated for trial and later nolle prossed. At a jury trial in July 2022, the jury found Ragland not guilty of Count 6 and guilty of all remaining charges. The trial court sentenced Ragland to life in prison without the possibility of parole on Count 1, a consecutive life sentence on Count 3, and a consecutive five-year sentence on Count 5. Counts 2 and 4 were either vacated by operation of law or merged for sentencing purposes. Ragland timely filed a motion for new trial, and the trial court denied it following a hearing. Ragland timely filed a notice of appeal, and his appeal was docketed to this Court's term beginning in December 2025 and submitted for a decision on the briefs.

consider as a suspect in Adair's death, had a 9mm handgun; (2) admitting a recorded jail call and allowing a detective to identify the speakers in the call despite the lack of a proper foundation; and (3) allowing a detective to opine that Ragland's statements in the recorded call constituted an admission that he was there at the time of the shooting. Ragland also argues that (4) trial counsel was ineffective on various grounds, and that (5) the cumulative prejudice from these errors requires a new trial. None of these claims have merit, so we affirm.

The trial evidence showed the following.[2] Courtney Johnson was best friends with Adair and considered him to be "like [a] brother." Johnson was also friends with Justin Cunningham, who was best friends with Ragland and introduced him to Johnson. In November 2016, Johnson introduced Adair to Ragland, from whom she bought drugs. Adair also began buying drugs from Ragland, and Johnson often traveled with Adair during his trips from Tennessee to Ragland's residence in Atlanta, where she often saw a black Lincoln Navigator. Johnson said that during these drug deals, Ragland never sent someone to do the deal for him and always did it himself.

On the evening of June 10, 2017, Richardson picked up his friend Adair and drove him to Atlanta in order to buy drugs. Richardson did not know whom they were going to meet and testified that Adair set up the meeting. According to Richardson, he and Adair had nearly $6,000 between them, but neither of them carried a gun.

While Richardson and Adair traveled to Atlanta, Adair communicated by phone with someone about where to meet, settling on a park in DeKalb County near Ragland's residence. There was a black Navigator already there, with Ragland and

---

[2] Because this case involves a question of harm stemming from limiting the scope of the cross-examination of a witness and assumed deficiency of counsel, we set out the evidence in detail rather than in the light most favorable to the jury's verdict. See *Wood v. State*, 316 Ga. 811, 812 n.2 (2023).

another person sitting in it, when Richardson and Adair arrived, and Richardson parked a few spots away. Cell-site location data showed that cell phones belonging to Ragland and Adair pinged off the same sector of the same tower that covered the crime scene between 12:08 a.m. and 12:19 a.m. on June 11. Ragland's cell phone was not pinging off a tower that serviced his residence during this time.

Adair exited Richardson's car and entered the passenger's side of the black Navigator. An unidentified individual who had been sitting in the Navigator got out and smoked cigarettes with Richardson. Richardson testified that about a minute later, Adair and Ragland got out of the black Navigator, and Adair told Richardson that someone else was going to bring the drugs. [3]

According to Richardson, Adair asked Richardson to "let them hear" the motor of his car, and "they," including Ragland, advised him to go down the road. Richardson drove away, leaving Adair behind, and then "floored the gas" coming back into the park. As Richardson was driving back into the park, he heard two gunshots and saw a muzzle flash. Richardson left the area, retrieved his phone that had fallen under a seat of the car, and then called his girlfriend. Despite saying that he left the area immediately, Richardson placed the call at 12:27 a.m., and service was provided by a tower that serviced the park. Richardson explained that he did not call 911 because he was on parole and did not want to get into trouble. Richardson received a call from Adair's fiancée and told her what happened.

Johnson knew that Adair was going to Atlanta to buy drugs from Ragland, and she received a call from Adair's fiancée in the early morning hours on June 11, reporting that Adair could not be located. Johnson then called Ragland to ask what Ragland did

---

[3] At one point, Richardson testified that he had never seen Ragland before trial, but on cross-examination he specifically confirmed Ragland was the person who sat with Adair in the Navigator.

3

and ask about Adair's whereabouts. Ragland responded that he did not know what happened to Adair and that he had sent someone else to the park to meet Adair. Johnson confronted Ragland, saying his story was "bulls**t," and Ragland hung up on her. A few days later, Ragland texted Johnson, telling her,

> I'm just gonna say this one time and leave it at that. I will spare u but take s**t out on yo kids if u keep playing with me. I had nothing to do with that s**t period. I did solid business wit bra. I don't move like that. But I'm no hoe by a long shot. If you want to see how I get down keep f**kin wit me.

Johnson took this message as a threat.

Richardson drove back to Tennessee following the shooting. Upon returning, he made a plan with Adair's fiancée, along with a few others, to drive to Atlanta to see if they could find Adair by visiting hospitals, but they were unable to find him and returned to Tennessee.

Police arrived at the park at about 1:39 a.m. on June 11, and the responding officer discovered Adair's body lying face down in a pool of blood. Adair was dead and had two gunshot wounds to his head. At the time of discovery, Adair was not wearing pants. Police did not find a cell phone or wallet, but found three 9mm shell casings, Adair's identification card, and some coins near his body. A detective testified that, based on the circumstances, it appeared that Adair had been robbed. The GBI tested the shell casings recovered from the scene and determined that they were all fired from the same weapon.

Sergeant McBride was the lead detective on this case. After talking to Johnson, Sergeant McBride began investigating Cunningham and learned that he was good friends with Ragland and was in jail in Anderson County, Tennessee at the time of Adair's death. Sergeant McBride contacted the facility where Cunningham was being detained to request recordings of any

4

calls with Ragland's phone number.

Sergeant McBride identified State's Exhibits 36 and 40 as CDs containing the jail calls he received, and they were admitted into evidence without objection. A call from June 12, 2017, at 3:00 p.m. — one day after Adair's death — that is part of Exhibit 40 was played for the jury, and Sergeant McBride explained that the call was between Ragland and Cunningham, even though the recording announced that the inmate was someone other than Cunningham.[4] Sergeant McBride testified that he had listened to the call at least 15 times, and he heard "an admission" by Ragland. When asked what the "admission" was, Sergeant McBride explained:

> That he was there — that Kenny "got got." He was there when it occurred; Kenny got got. The — Mr. Cunningham asked him was it 12. Meaning was it the police. And he was like nah, nah. And then they start to laugh and then Cunningham says, "Uh, was it nice?" And it's an admission that he was there at the time of the shooting.

According to Sergeant McBride, after that exchange, Cunningham "realized, he just laughed also," then said "Hell, come get me bro." Sergeant McBride testified that, at the time of

---

[4] Although Ragland challenges State's Exhibit 40 on appeal, it contains 16 different files, and the parties do not specifically identify which file or files (or parts thereof) were played to the jury or which specific file is the subject of the challenge on appeal. Nevertheless, based on phrasing referred to by the parties, we identified one portion of a call that appears to be most applicable. Although the call is difficult to understand, it sounds like the speaker (Ragland) says, "They say Courtney's [unintelligible] came down here and got, got, got knocked off." The other speaker (Cunningham) asked if it was "Block 12" and if "it was something nice?" During closing argument, defense counsel represented that Ragland said, "They say Courtney's brother came down here and got knocked off," by which, counsel said, "Sheldon is saying he heard about the killing. Not that he committed the killing."

this call, the DeKalb Police had not yet released any information about the shooting to the public.

After the shooting, Ragland fled to Alabama where he conducted numerous internet searches for information about the shooting. Ragland also changed his phone number within ten days after the shooting.

Ragland did not testify at his trial or present any witnesses. But in cross-examining witnesses, Ragland elicited the following evidence. Richardson did not initially tell police the purpose of the trip was to buy drugs, and he never mentioned until trial that the drugs were not on site at the park despite travelling all the way down from Tennessee. Richardson also told the police he briefly left the park to buy a cigar at Adair's request, even though there was no evidence that he did. Richardson told the police that, after Adair exited the Navigator, Adair told Richardson he could leave because Adair had another ride coming. Richardson also initially reported that he heard three shots fired when he was driving back into the park (not the two he had testified about), and that he was also shot at. Richardson also told police he did not call anyone immediately (even though the evidence showed that he did).

In his defense, Ragland argued that there was no physical evidence linking him to the crime such that the case rested on Richardson's credibility as a result, and that Richardson's version of events varied and did not make sense. Ragland also argued that it made no sense for him to kill Adair and not kill Richardson, as there was too much risk to leave a witness alive, or, alternatively, to try to kill Richardson as he tried to enter the park rather than when Richardson was next to Adair (according to statements Richardson made to police). And Ragland argued that the police rushed to judgment to conclude he was responsible for Adair's death, accepting Richardson's version of events too readily and failing to consider Richardson as the possible perpetrator. Although Ragland said he was not accusing Richardson, he also

6

argued that Richardson made up stories to protect himself, including from the "legal implications of being involved in a new crime. Whether it be drug dealing or homicide."

1.  Ragland argues that the trial court erred by excluding testimony related to Richardson's possession of a 9mm handgun (the same caliber as the murder weapon). Ragland argues that the trial court excluded this evidence by preventing him from asking Sergeant McBride if there was a follow-up investigation after Richardson was arrested while possessing a 9mm gun, and that this limitation hampered his defense, which was to show that the police rushed to judgment and ignored evidence that Richardson may have been the actual shooter.

As an initial matter, the trial court did not "exclude" evidence that Richardson possessed a 9mm gun. During his trial testimony, Richardson admitted that he was being detained on a pending domestic violence charge and testified that he did not "really use guns or weapons." On cross-examination, Richardson admitted that he was found with a 9mm handgun when he was arrested in December 2021 for the domestic violence offense, and said he did not use guns at the time of Adair's death. By the time Sergeant McBride testified, Richardson already had admitted on the witness stand that he had a 9mm gun when he was arrested. So there was no "exclusion" of this evidence.

To the extent Ragland argues that the trial court improperly limited the scope of his cross-examination of Sergeant McBride, even if this issue was contained within his enumeration of error,[5] any error was harmless. A constitutionally improper denial of a defendant's opportunity to effectively cross-examine a witness is subject to harmless-error analysis. See, e.g., *Hudson v. State*, 308 Ga. 443, 448 (2020); *State v. Vogleson*, 275 Ga. 637, 641

---

[5] *Wallace v. State*, 303 Ga. 34, 37–38 (2018) ("an appealing party may not use its brief to expand its enumeration of errors by arguing the incorrectness of a trial court ruling not mentioned in the enumeration of errors" (quotation marks omitted)).

(2002). For a constitutional error to be deemed harmless, the State must show beyond a reasonable doubt that the error did not contribute to the verdict. See *Mangum v. State,* 274 Ga. 573, 577 (2001).

Here, there was no harm in preventing Ragland from questioning Sergeant McBride about any follow-up investigation. Ragland makes no showing as to what Sergeant McBride would have testified to if asked about this topic. Instead, he merely argues that limiting this inquiry was harmful because the evidence would have supported his defense that the police's investigation was incomplete insofar as they did not investigate Richardson as the shooter. But in cross-examining Sergeant McBride, Ragland was permitted to ask whether he had confirmed whether certain parts of Richardson's story about the night of the shooting were true and whether Richardson or the car he was driving that night were ever processed for forensic evidence. The answer to these questions was essentially "no," and Sergeant McBride confirmed that Richardson had deactivated a "drop" phone[6] the day of the murder. In other words, Ragland conducted a thorough cross-examination of Sergeant McBride to show that the police did not adequately investigate Richardson. Ragland advanced this theory to the jury even without being able to ask about any follow-up investigation about the 9mm firearm found on Richardson several years after the crime and pointed to trial evidence to support that argument. And the jury had already heard from Richardson himself that he possessed a gun, which contradicted his prior testimony that he had nothing to do with guns, and heard about many other inconsistencies between Richardson's testimony and his initial statements to police.

---

[6] Sergeant McBride testified that a "drop" phone is a temporary phone that is typically discarded after a short use and may be used to conceal illegal activity because the user would not "have the phone long enough for the law enforcement to start figuring out" who is using the phone number for the device.

Ragland's defense — the same one he asserts on appeal — was supported by evidence in the record, and the jury simply rejected it. We are persuaded beyond a reasonable doubt that the result of the trial would have been the same had he been allowed to ask about any follow-up investigation. The jury was presented with this defense and rejected it in light of the strong evidence of guilt. Namely, it was undisputed that Adair traveled to Atlanta for the purpose of meeting Ragland to buy drugs, a black Navigator associated with Ragland was at the scene of the crime, the park where Adair was killed was near Ragland's residence, and cell phone location data placed both individuals' cell phones at the park at the same time of the shooting. Moreover, Ragland fled the state after the shooting and changed his cell phone number. See *Jenkins v. State*, 313 Ga. 81, 89 (2022) ("Evidence of flight is generally intrinsic, as the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, is admissible as evidence of consciousness of guilt for the charged offense, and thus of guilt itself." (cleaned up)).

In sum, eliciting additional evidence that the police did not adequately investigate Richardson would not have made a meaningful difference given this strong evidence of guilt and because the evidence Ragland sought to elicit was largely cumulative of other evidence casting doubt about the police's investigation and showing that Richardson may have been the shooter. See *Jones v. State*, 305 Ga. 750, 754 (2019) (holding that any error in limiting the appellant's cross-examination on the issue of parole eligibility was harmless, in light of the strength of the evidence against him and substantial testimony from his accomplice "concerning the favorable plea deal resulting in a major reduction in the sentences [she] faced, thereby establishing [her] potential bias toward the State"); *McCord v. State*, 305 Ga. 318, 324 (2019) (holding that even if admission of certain statements violated the Confrontation Clause, any error was harmless beyond a reasonable doubt because they were

9

cumulative of other evidence and the evidence of guilt was strong).

2.    Ragland argues that the trial court plainly erred (1) in admitting State's Exhibit 40 (recorded jail calls) because a sufficient foundation was not laid and (2) in allowing Sergeant McBride to identify Ragland and Cunningham when the detective had no basis for making this determination. This claim fails.

Ragland did not object to the admission of State's Exhibit 40 or to Sergeant McBride's testimony regarding it, so we review his claim only for plain error. See OCGA § 24-1-103(d). See also *Adams v. State*, 306 Ga. 1, 3 (2019) (plain error review under OCGA § 24-1-103(d) is available for unpreserved challenges to evidentiary rulings). To establish plain error, Ragland must show that the trial court made a legal error that was not affirmatively waived, was "clear and obvious," likely affected the outcome of the trial, and "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Dees v. State*, 322 Ga. 498, 500–01 (2025). The failure to meet one element of this test dooms a plain error claim. See *State v. Herrera-Bustamante*, 304 Ga. 259, 264 (2018).

The State argues that Ragland's claim fails because he affirmatively waived any error. "For purposes of plain error review, an affirmative waiver is the intentional relinquishment or abandonment of a known right." *Holloway v. State*, 320 Ga. 668, 671 (2025) (cleaned up). Generally, trial counsel's failure to object, by itself, does not constitute an affirmative waiver, but it can amount to an affirmative waiver if an "appellate court can discern" from the record that the failure was a considered choice. See *Vasquez v. State*, 306 Ga. 216, 230 (2019).

Here, at the motion for new trial hearing, trial counsel said he did not object because he wanted the call to be admitted for two reasons. Trial counsel first explained that the State was "throwing this balloon up about motive," and he could use the recording to rebut that claimed motive and show that Ragland

10

had no reason to kill Adair. In particular, the State argued at trial that Ragland had a motive to rob and kill Adair because he wanted money to post Cunningham's bond, and in closing argument, referred to Ragland's statement in the recorded call about having money and Cunningham's statement to "come get me" as evidence to support this motive. Defense counsel challenged that motive in closing argument, arguing that Ragland never said he would bail Cunningham out of jail in the call and that there was no evidence he ever went to Anderson County, Tennessee for that purpose.

Trial counsel's second reason for not objecting was that he wanted to use the evidence to support Ragland's denial of culpability. Trial counsel explained that Ragland's statement in the call that "they say" that Adair was shot and killed in Atlanta was used to show that Ragland was not present for the shooting and was merely repeating what others told him. In closing argument, trial counsel argued that Ragland heard about the shooting before any news was released to the public because Johnson called him on the night Adair went missing to ask about his whereabouts and to say that some people were looking for Adair at hospitals. Counsel argued that Ragland made the natural deduction that Adair was probably dead.

In the light of trial counsel's testimony at the motion for new trial hearing and his conduct at the trial itself, we can discern that counsel had a tactical reason for not objecting to the admission of Exhibit 40 or to Sergeant McBride's testimony that Ragland and Cunningham were the individuals on the call. Accordingly, this claim of error fails at the first step of plain error review. See *Vasquez v. State*, 306 Ga. 216, 231 (2019) (because the record reflected that trial counsel elected not to request an accomplice-corroboration jury instruction as part of conscious defense strategy, any request for that jury instruction was intentionally waived).

3.  Ragland argues that the trial court plainly erred in

11

allowing Sergeant McBride to testify that Ragland's statements in the recorded jail call constituted an admission that he was in the park at the time of the shooting. Ragland argues that other than the reference to "12," the speakers used plain language in the call, and it was improper for Sergeant McBride to interpret this plain language under OCGA § 24-7-701(a).[7] We disagree.

Even if there was clear and obvious error in allowing Sergeant McBride to offer his opinion about what Ragland meant in the recorded call, Ragland cannot establish plain error because any error did not affect the outcome of his trial. Ragland relies on *United States v. Hawkins*, 934 F3d 1251 (11th Cir. 2019), to support his argument that the error affected the outcome of his trial. But in that case, the Eleventh Circuit concluded that the agent's improper testimony contributed to the verdict because his testimony was extensive, it constituted the crux of the government's case as he was the principal witness, there were several examples of improper opinion testimony, and he was the only witness who specifically testified about the defendant. Id. at 1263–64, 1266–67 (comparing to other cases where reversal was not warranted based on improper opinion testimony). Here, Sergeant McBride was not the sole or primary witness, his testimony was limited and was not emphasized or mentioned again, and he was not the only witness who provided incriminating evidence against Ragland. Cf. *United States v. Pendergrass*, 995 F3d 858, 881 (11th Cir. 2021) (even if agent's testimony "strayed into realm of improper interpretation," the circumstances were distinguishable from *Hawkins* because the agent "was neither the sole nor the primary witness in the case").

___

[7] That code section provides that if a witness is not testifying as an expert, the witness's testimony in the form of "opinions or inferences" is limited to those that are "(1) [r]ationally based on the perception of the witness; (2) [h]elpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and (3) [n]ot based on scientific, technical, or other specialized knowledge within the scope of" OCGA § 24-7-702. OCGA § 24-7-701(a).

Although the State made reference to the phone call in closing argument, arguing that it was evidence of motive, it did not emphasize the nature of the call as an "admission" that Ragland was present for the shooting.

Moreover, our review of the recorded call does not show that Ragland made a clear admission that he was present when Adair was killed. And even if the jury deferred to Sergeant McBride's assessment of the call based on being unable to discern the contents of the call (since the recording itself is difficult to understand), such an "admission" of mere presence at the scene of the crime pales in comparison to the other strong evidence of guilt that was presented, as discussed above. Given the limited nature of Sergeant McBride's testimony and the strong evidence of guilt, Ragland has failed to establish that any error in admitting the "admission" opinion testimony likely affected the outcome of the trial.

4. Ragland argues that trial counsel was ineffective on several grounds. None of these grounds have merit.

To prevail on any of his claims, Ragland must show both that his counsel's performance was constitutionally deficient and that he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 US 668, 687 (1984). To establish deficient performance, Ragland must "overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Mims v. State*, 304 Ga. 851, 855 (2019) (quotation marks omitted). Our inquiry focuses on the objective reasonableness of counsel's performance, not counsel's subjective state of mind. See *Bozzie v. State*, 302 Ga. 704, 714 (2017). To demonstrate prejudice, Ragland must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Mims*, 304 Ga. at 855

13

(quotation marks omitted). The failure to meet either of the prongs is fatal to an ineffectiveness claim. See *Smith v. State*, 296 Ga. 731, 733 (2015). In considering an ineffectiveness claim, we review a trial court's factual findings for clear error and its legal conclusions de novo. *Lawrence v. State*, 286 Ga. 533, 534 (2010).

(a)    Ragland argues that trial counsel was ineffective for failing to object to the admission of the recorded call between Ragland and Cunningham and to the testimony that they were the speakers on the call. As discussed above, trial counsel testified that he wanted the call to be admitted in order to rebut the State's proffered motive and to show that Ragland was merely repeating what he had heard about Adair. Given this testimony, Ragland fails to establish that trial counsel's chosen defense strategy of attacking the State's case by using the evidence rather than objecting to its admission was objectively unreasonable. See *Gomez v. State*, 301 Ga. 445, 459 (2017) (counsel's decision not to object to expert testimony as in violation of discovery rules but instead to show the jury that the testimony was at odds with other evidence was not "patently unreasonable"); *Johnson v. State*, 294 Ga. 86, 92–93 (2013) ("[C]ounsel's decision not to object to [witness's] testimony and to instead cross-examine [the witness] ... was a matter of trial strategy and was not so patently unreasonable that no competent lawyer would have made the same decision.").

(b)    Ragland next argues that trial counsel was ineffective for failing to object to Sergeant McBride's opinion testimony that Ragland made an admission in the recorded call. We disagree.

At the motion for new trial hearing, although trial counsel testified that he had no specific recollection of why he did not object to this testimony, counsel stated that that he might not have been concerned about a passing comment such that he would not have wanted to draw more attention to it by objecting. Moreover, during closing argument, trial counsel urged jurors to listen to the tape themselves and to draw their own conclusions

14

about the conversation, arguing that it was not an admission but was merely a statement of what Ragland heard about the killing. Given that Sergeant McBride's testimony was limited, a decision to not draw attention to McBridge's characterization of the conversation and instead use the call to argue that Ragland was actually not present for the crime was reasonable trial strategy. See *Gaston v. State*, 307 Ga. 634, 642 (2020) (trial counsel's decision not to object to testimony that defendant admitted to killing someone was reasonable where the objection would have drawn attention to the testimony and trial counsel instead wanted to pursue a strategy that supported a possible acquittal); *Jacobs v. State*, 306 Ga. 571, 575–76 (2019) (trial counsel's decision not to object to testimony was not deficient performance where counsel did not want to "overemphasize any of the testimony to the jury by objecting to it").

(c)　　　Ragland next argues that trial counsel was ineffective for failing to challenge the State's cell-site location evidence by consulting with a qualified expert or presenting expert testimony. This claim fails.

At the motion for new trial hearing, trial counsel testified that when he learned the State had intended to use a new FBI technology that generated more precise cell-site location data, he began to search for an expert on the subject in order to review and advise him about the data. Counsel identified Larry Daniel as a potential expert, and the two discussed Daniel's qualifications, experience, and ability to help in this case. Trial counsel then sent Daniel the discovery and a description of his theory of the case, along with the problems involving the data showing that Ragland's and Adair's cell phones were together in one place during the crime. After Daniel and his associate analyzed all the cell-site location data, they informed trial counsel that the techniques used by the State were valid and the way in which they were applied to Ragland's case was reliable and accurate. Trial counsel learned that both phones pinged off the same sector of the same tower that serviced the same area of the park at the

15

same time, meaning that the two phones were in the same location. Daniel essentially told trial counsel, "You don't want me to testify."

Ragland acknowledges that trial counsel took some steps to assess the evidence, but that counsel should have nevertheless asked for a second opinion, like the opinion of the expert Ragland presented at the motion for new trial hearing.[8] But under this Court's precedent, "the testimony of the new expert could not show deficient performance because the trial lawyer[] consulted with a qualified expert, [his] consultations gave [him] no basis for objecting to the conclusion reached by [the State's expert], and [he was] under no obligation to search further than [he] did for an expert who would give [him] an opinion otherwise." *Yancey v. State*, 292 Ga. 812, 820 (2013). Thus, Ragland's claim fails.

5. Ragland argues that that his convictions should be reversed due to the cumulative prejudice resulting from the trial court's errors and trial counsel's ineffectiveness. See *State v. Lane*, 308 Ga. 10, 14 (2020) (courts are to "consider collectively the prejudicial effect of trial court errors and any deficient performance by counsel — at least where those errors by the court and counsel involve evidentiary issues"). We assumed two instances of error — improper limitation of cross-examination and allowing Sergeant McBride to opine about an "admission" — but found no others. These assumed "errors addressed entirely different issues in the case." *Pender v. State*, 311 Ga. 98, 120 (2021). As explained above, each assumed error produced very little, if any, harm. Although we have yet to decide how multiple standards for assessing prejudice are to be considered cumulatively, we need not do so here, because Ragland's cumulative prejudice claim fails even under the higher standard

_____

[8] Ragland's expert witness testified that given how close the crime scene was to Ragland's home, the two identified towers could service both locations, and it was "completely likely that" Ragland's phone did not move at all.

16

implicated by these errors (proof that the error was harmless beyond a reasonable doubt).[9] Given the strength of the properly admitted evidence against Ragland, we are persuaded beyond a reasonable doubt that the cumulative prejudice of the assumed errors did not deny him a fair trial. See *Platt v. State*, 319 Ga. 1, 12 (2024) (holding that, because two assumed "errors produced very little, if any, harm[,] ... given the strength of the evidence, even if these assumed errors could be considered cumulatively, the cumulative prejudice did not deny [the appellant] a fair trial"); *Lofton v. State*, 309 Ga. 349, 367 (2020) (the combined actual and assumed evidentiary errors and deficiencies by counsel did not warrant a new trial, because "even when considered as a whole under the most demanding standard that applies to any of the alleged errors, the cumulative prejudicial effect of the actual and assumed evidentiary errors and counsel's deficiencies is not sufficient to outweigh the strength of the properly admitted evidence of [the a]ppellant's guilt").

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*

---

[9] One assumed error in this case was constitutional in nature, and the other one was not. In other cases, we assumed that the more stringent constitutional prejudice standard applied without having to determine how different standards may apply together. See, e.g. *Quintanar v. State*, 322 Ga. 61, 75 & n.6 (2025); *Pender*, 311 Ga. at 120.